**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.M., A MINOR | : | No. 1 MAP 2021 |
| | : | |
| | : | Appeal from the Order of Superior |
| APPEAL OF: B.M., MOTHER AND D.M. | : | Court at No. 3060 EDA 2019 dated |
| AND P.M., MATERNAL GRANDPARENTS | : | September 3, 2020, reconsideration |
| | : | denied October 14, 2020, Reversing |
| | : | the Decree dated September 27, |
| | : | 2019 by the Montgomery County |
| | : | Orphans' Court at No. 2019-A0053 |
| | : | and Remanding. |
| | : | |
| | : | ARGUED: April 14, 2021 |


**OPINION**


**JUSTICE DOUGHERTY**                                    **DECIDED: July 21, 2021**

We granted discretionary review of the Superior Court's decision invalidating the

involuntary termination of a father's parental rights where the child's mother voluntarily

relinquished her own rights but would continue to reside with the pre-adoptive maternal

grandparents and maintain her parental role. The panel viewed the matter to involve

unlawful custody gamesmanship in conflict with our decision in *In re Adoption of M.R.D.*,

145 A.3d 1117 (Pa. 2016). Although we discern no direct conflict between the proposed

adoption and *M.R.D.*, and disapprove of the Superior Court's holding to the contrary, we

affirm the panel's disposition on the alternative grounds discussed herein.[1]

---

[1] This Court may affirm the order of the court below if the result reached is correct without
regard to the grounds relied upon by that court. *Fitzpatrick v. Natter*, 961 A.2d 1229, 1244
n.17 (Pa. 2008), *citing C.B. ex rel. R.R.M. v. Dep't of Pub. Welfare*, 786 A.2d 176, 178

## I. Background

Appellee J.C. (Father) and appellant B.M. (Mother) are the natural parents of C.M., born in January of 2016. Father and Mother lived together in Texas for a period of time prior to C.M.'s birth; however, the child was born in Pennsylvania, and Mother remained with C.M. in Pennsylvania, residing with her parents (Grandparents). N.T. 6/10/2019 at 54, 56; N.T. 7/17/2019 at 9, 33, 55. Father was present at the hospital for C.M.'s birth and purchased a crib and changing table for use at Grandparents' home. N.T. 6/10/2019 at 41, 54; N.T. 7/17/2019 at 19, 55, 61, 95, 124, 128. He returned to Texas, but ultimately moved back to Pennsylvania in late spring or summer of 2016. N.T. 6/10/2019 at 56, 116; N.T. 7/17/2019 at 54, 62, 99. Unable to reach Mother by phone and believing she had blocked his calls, Father attempted to contact Mother in person at Grandparents' home; Mother instructed Father he was not allowed on the property, but accommodated his request to arrange visits. N.T. 6/10/2019 at 55-59, 117. Between August and September or early October of that year, Mother brought C.M. to a park to visit with Father approximately six times, then visits ceased. N.T. 6/10/2019 at 58-59, 116-17; 7/17/2019 at 99. According to Father, after several subsequent unsuccessful attempts to reach Mother by calling or texting, he was able to reach her in December of 2016 using a different phone number, and asked to arrange a visit to deliver Christmas presents to C.M; Mother responded that he was not C.M.'s father and C.M. did not need anything, and no visit was arranged nor presents delivered. N.T. 6/10/2019 at 15, 59-61, 91; N.T. 7/17/2019 at 106-07, 110-11, 151-52. Father did not attempt to reach Mother about visits again until November 22, 2017, at which time Mother hung up the phone; Father attempted to call back several times that day to no avail, and no visit occurred. N.T.

n.1 (Pa. 2001). As was the case in *Natter*, in this case, the alternative ground is one which appellee preserved below and urges on this appeal. *Id.*

6/10/2019 at 62-67, 118, 125; N.T. 7/17/2019 at 57, 108-10, 152-53, 169; Orphans' Court Exhibit F-3 (Father's phone record). His next attempted contact with C.M. was in February of 2019. N.T. 6/10/2019 at 71-72; N.T. 7/17/2019 at 57, 110, 112-14, 154-56.

Beginning in December of 2017, Father spent several weeks in jail following an incident in which he assaulted and fled from a police officer responding to a request for mental health assistance placed by Father's mother. N.T. 6/10/2019 at 26; N.T. 7/17/2019 at 112, 158-59. He pleaded guilty and received a sentence of two years' probation and a driver's license suspension. N.T. 6/10/2019 at 26; N.T. 7/17/2019 at 158-59. Upon his release in February of 2018, Father was hospitalized and received inpatient treatment for post-traumatic stress disorder (PTSD) through a Veterans Affairs (VA) hospital until April 2018, and then resided in a transition house for veterans until October 2018 while his medication was monitored. N.T. 6/10/2019 at 17; N.T. 7/17/2019 at 113-14. Since then, he has resided in a VA-subsidized home with his then-girlfriend, now-wife, A.S., her two children, and their child together who was born in early 2019. N.T. 6/10/2019 at 11-12, 96, 99-100; N.T. 7/17/2019 at 114, 127. On weekends he has custody of his two older children, born in 2012 and 2014. N.T. 6/10/2019 at 24, 40, 96-97, 114; N.T. 7/17/2019 at 123. Mother is in contact with Father's aunt as well as the mother of Father's older children; she has provided photographs of C.M. to Father's aunt, and the children have had some ongoing contact with C.M. who they know is their sibling. N.T. 6/10/2019 at 39-42, 71-72, 105, 113; N.T. 7/17/2019 at 40-41, 53-54, 58, 115.

The next and final time Father attempted to reach Mother about visiting C.M. was February 19, 2019, and after a brief exchange she hung up the phone; Father attempted to call back several times, and Mother responded with a text instructing Father not to contact her again. Orphans' Court Exhibit F-3; N.T. 6/10/2019 at 71; N.T. 7/17/2019 at 57, 110, 112-16, 154-56. It is undisputed that Father has not seen C.M., or provided any

gifts, letters, supplies, or financial support, since autumn of 2016, while Mother and Grandparents have shared caregiving responsibilities and provided generously for C.M.'s needs and welfare since birth. Orphans' Court Opinion, 9/26/2019, at 4, 8, 10, 13.

On February 28, 2019, Father filed a complaint for custody, seeking to establish visitation with C.M. and gradually increase his involvement to shared custody. Orphans' Court Exhibit F-4, Complaint for Custody at 3; N.T. 6/10/2019 at 68, 70; N.T. 7/17/2019 at 75, 78, 95-96, 118-19. On March 13, Mother filed a complaint for child support, and Father complied with the order for paternity testing which confirmed his status as the biological father of C.M. N.T. 6/10/2019 at 81, 83, 85-86; N.T. 7/17/2019 at 75-76, 116-17. Father and Mother both participated in custody mediation required by the county's domestic relations court, but reached no agreement. N.T. 6/10/2019 at 74; N.T. 7/17/2019 at 96, 173. Father and Mother attended a custody conciliation conference before a hearing officer, but again reached no agreement. N.T. 6/10/2019 at 74-76; N.T. 7/17/2019 at 96-97, 173. The conciliation report issued on April 3, 2019. N.T. 6/10/2019 at 76-77, 79-80.

On April 15, 2019, Grandparents, joined by Mother, filed a petition to involuntarily terminate Father's parental rights, averring grounds existed under Subsection 2511(a)(1) of the Adoption Act, 23 Pa.C.S. §§2101-2938 (the Act), which allows termination of parental rights if "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Orphans' Court Docket, entries 4/15/2019, 4/26/2019; Petition for Involuntary Termination of Parental Rights of [J.C.], Biological Father at ¶5; 23 Pa.C.S. §2511(a)(1). On April 29, 2019, Mother withdrew her complaint for child support. N.T. 6/10/2019 at 86-87. Thereafter, the domestic relations court issued a stay of the custody proceedings, Mother

filed a petition to voluntarily relinquish her parental rights to C.M., Grandparents filed a petition to adopt, and the matter proceeded to orphans' court for an evidentiary hearing on the termination of parental rights petitions.[2]  N.T. 6/10/2019 at 86; N.T. 7/17/2019 at 85; Orphans' Court Docket, entries 4/26/2019, 4/30/2019.

Regarding the reasons for pursuing the adoption by Grandparents, the orphans' court found the testimony of Mother and maternal grandfather (Grandfather) credible. Orphans' Court Opinion, 9/26/2019, at 11.  Mother testified she has lupus, a common autoimmune disease that affects her kidneys, and scleroderma, a rare build-up of collagen in the body that hardens skin and connective tissues including organs, joints, and muscles; she stated there is not much known about scleroderma, she does not make attempts to research it, and it is usually fatal within a period of ten years, though the prognosis among different individuals varies.  N.T. 7/17/2019 at 35-38.  She testified she receives treatment from three physicians approximately every three months which includes medication, and she experiences some bad days when pain and stiffness make it difficult to move, though currently she maintains a regular routine of school, work, and sharing care for C.M. with Grandparents without physical impediments.  *Id.* at 35-36, 40, 73-75.  Regarding the need to pursue adoption, Mother testified, "[Grandparents] know her routine.  They know everything about her.  She has full trust in them, and so do I, about how they're going to raise her.  They have always helped both of us since she's been born, and they have helped me my whole life.  And unlike [Father], they helped me with everything, and I have no doubt that they will continue to do so."  *Id.* at 39.  She further provided that, because she does not know what her own future will be, she needed to ensure C.M.'s future would be secure with her parents as she has no trust in Father.

---

[2] Father, Mother, and Grandparents were represented by counsel throughout the orphans' court proceeding.  Legal counsel was appointed for C.M. by court order dated May 21, 2019.

*Id.* at 63-64, 68.  When asked why she sought termination of Father's rights at this juncture, as opposed to in either of the previous two years when he had been absent, Mother testified, "[Father] had no interest in being in my child's life for those years, so I never had to worry about petitioning for the relinquishment of his parental rights[,]" and further agreed it was not until Father filed in court to see C.M. that she decided to file the termination petition.  *Id.* at 84-85.

Grandfather testified he understands Mother's prognosis can be debilitating and fatal, but aside from a couple of bad days, Mother has had no problems caring for C.M., and there is no plan to for Mother to move out or change roles following the adoption.  *Id.* at 11, 13-14, 24, 27-31.  Regarding his reason for wanting to adopt C.M., he stated, "I just want to make sure she's well taken care of and a [sic] stable home with us.  We want to be consistent with her routines in life and what she knows, with a loving family."  *Id.* at 14. Responding to why it was important to secure C.M.'s fate through adoption, he stated, "I would have no faith in [Father] after the first three years of her life not wanting to participate with her, and me and my wife having brought her up from when she was a baby" and "[w]e just want to make sure with education, she's properly taken care of, all of her wants and needs."  *Id.*  Asked why the adoption was in C.M.'s best interests, he stated, "[t]he consistency in her life right now.  She is thriving where she's at.  She's just surrounded by a loving family, aunts, uncles.  Anybody in our family would do anything for her."  *Id.* at 23.

Father testified, as a result of his active military duty in 2014, he has PTSD and a hip injury which required two surgeries; he receives veterans' benefits and disability payments due to the hip injury, and these are his only income sources.  N.T. 6/10/2019 at 20-22, 25, 37, 43-53; N.T. 7/17/2019 at 101-05, 124-25, 146.  He testified that each time he attempted to contact Mother, she either would not answer, or told him he was not

C.M.'s father and hung up the phone; however, Father also conceded Mother had said he was not "a" father, and "just a sperm donor," and the orphans' court found him not credible regarding any of his testimony he questioned paternity. N.T. 6/10/2019 at 55-56, 65-67, 106-07, 117; N.T. 7/17/2019 at 130-31; Orphans' Court Opinion, 9/26/2019, at 6. Father testified he believed Mother would attempt to raise harassment charges against him if he made more contact as a result of a phone call he received; the orphans' court found this claim to lack specificity and corroboration. Orphans' Court Opinion, 9/26/2019, at 5. Father did file to enforce custody of his older children when they were small, which he achieved through agreement with their mother and without legal assistance; he admits he knew how to pursue custody of C.M., but did not do so until February of 2019, then believing it was his only option. N.T. 6/10/2019 at 97-98, 114-15; N.T. 7/17/2019 at 125. He testified that children were not allowed to visit at the transition housing program where he lived in 2018, and admits he did not attempt contact with C.M. immediately upon returning home in October, waiting until February 2019. N.T. 7/17/2019 at 113-14. Father and A.S. testified he has some physical limitations due to his hip injury, but he provides care and support for all of their children. N.T. 6/10/2019 at 25, 100; N.T. 7/17/2019 at 123, 127-28, 144-49.

Father further testified he received photos and learned about C.M.'s activities through his aunt who was in contact with Mother, and he wanted to begin seeing C.M. gradually, amenable to a supervised setting. N.T. 7/17/2019 at 71-72, 115, 118-19. Following his receipt of the conciliator's April 3, 2019 report, Father began researching options for reconciliation or reunification therapy with C.M., and made arrangements for a VA program to subsidize a private therapy provider at no cost to Father or Mother. N.T. 6/10/2019 at 76-81. Father then received Grandparents' petition to terminate his parental rights in mid-April, and the therapy never began. N.T. 6/10/2019 at 11; N.T. 7/17/2019 at

97. Father agreed he had not been a father to C.M. in 2017 and 2018, and she had no bond with him.[3] N.T. 6/10/2019 at 109; N.T. 7/17/2019 at 143.

The orphans' court believed "[t]he first factual question requiring resolution is whether the birth father, for a period of more than six months, has failed or refused to perform parental duties[,]" and — noting Father took no steps through legal channels to seek custody or visitation of C.M. in 2016, 2017, or 2018 despite having done so successfully, without the aid of an attorney, for his older two children — concluded Father failed and refused to parent C.M. for a period of over two years. Orphans' Court Opinion, 9/26/2019, at 2-5.

The orphans' court then considered Father's explanation for his failure to parent his child, while noting settled jurisprudence requires a parent to affirmatively perform parental duties and exercise reasonable firmness in the face of obstacles to maintaining a place of importance in a child's life. *Id.* at 2, 5-10, *citing*, *inter alia*, *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 (Pa. 1998) (if evidence establishes failure to perform parental duties or settled purpose of relinquishing parental rights, the court must consider (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) the effect of termination of parental rights on the child pursuant to Section 2511(b)); *In re Orwick's Adoption*, 347 A.2d 677, 680-81 (Pa. 1975) (evaluating totality of the circumstances, noncustodial parent's four attempts to contact child through the mail in the 22 months before the hearing did not demonstrate reasonable firmness). The court found "[a]lthough birth mother, through her rejection of his requests, contributed to his lack of contact with the child, birth father in this case made no serious and sustained effort to create and maintain a relationship with the child or to

---

[3] Father also objected to Mother's voluntary relinquishment of her parental rights. N.T. 7/17/2019 at 202-03.

provide support to her in any way for a period of more than two years." *Id.* at 8. The court further observed,

> [i]t is true that birth mother decided that she did not wish to continue a relationship with birth father and that after six or seven visits in 2016, she decided that she did not wish her child to have visits with the birth father. It is true that she did not answer all of his phone calls and communicated to him that she did not need his help and did not consider him to be acting as a father to her daughter, and that she did not desire any further communication from him. Nevertheless, birth father testified that he only tried to call her on two occasions in 2016 and 2017. He made no other efforts whatsoever to see or support his child. Even though he had successfully filed a petition as a self-represented litigant seeking visits with his two older children, and thus knew how to file such a complaint, he took no such action to file a custody complaint with respect to this child until she was over three years old in February of 2019. While mother was not cooperative with father and did not make it easy for him to see this child, this court simply cannot conclude that two phone calls in over two years constitute a diligent effort to act as a father.

*Id.* at 9-10. The orphans' court thus determined Father did not exercise reasonable firmness to establish a relationship with C.M. and there was no post-abandonment contact with the child for the court to consider. The court further concluded clear and convincing evidence demonstrated grounds to terminate his parental rights pursuant to Subsection 2511(a)(1) of the Act. *Id.*

Addressing Father's argument the proposed adoption was a contrived effort to deprive him of his parental rights, the orphans' court found the testimony of Mother and Grandfather credible regarding their reasons for seeking the adoption, *i.e.*, in light of Mother's diagnoses "which are debilitating and may prove fatal[,]" the proposed adoption would provide C.M. with the stability of being raised by family members who have cared for C.M. since birth. *Id.* at 10. Citing Father's testimony admitting he shared no parental bond with C.M., the court further determined C.M. would suffer no detriment as a result of the termination of Father's rights, and the proposed adoption arrangement would best

meet C.M.'s needs and welfare "under the unusual circumstances" of Mother's medical condition and voluntary relinquishment of her own rights to allow the adoption to proceed, thereby meeting the Act's additional requirements under Subsection 2511(b). Orphans' Court Opinion, 10/31/2019, at 3 (opinion pursuant to Pa.R.A.P. 1925(a)); Orphans' Court Opinion, 9/26/2019, at 12, 13; *see* 23 Pa.C.S. §2511(b) (court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child"). By separate decrees issued September 27, 2019, the orphans' court terminated the parental rights of Father and Mother.

Father appealed, and in the pertinent part of his Rule 1925(a) statement of errors, he generally challenged the sufficiency and weight of the evidence relied on to terminate his parental rights pursuant to 23 Pa.C.S. §§2511(a)(1) and (b).[4] *See* Concise Statement of Errors Complained of on Appeal at ¶¶2, 3, 6. Father rephrased his statement of the issues in his brief to the Superior Court, still challenging the sufficiency of the evidence supporting the termination of his parental rights pursuant to Subsections 2511(a)(1) and (b), but also arguing the termination did not promote the Adoption Act's purpose or intent as provided in this Court's decision in *M.R.D.*, which, according to Father, required the proposed adoption to create a "new family unit" that was not evident in this case given

---

[4] Specifically, Father claimed: "[t]he trial court committed an error of law and/or abused its discretion by finding that Petitioners proved by clear and convincing evidence that termination of Respondent/Appellant's parental rights was warranted pursuant to 23 Pa.C.S. §2511(a)(1)[;]" "[t]he trial court committed an error of law and/or abused its discretion by finding that C.M.'s developmental, physical and emotional needs and welfare are best served by terminating Respondent/Appellant's parental rights, pursuant to 23 Pa.C.S. §2511(b)[;]" and "[t]he trial court abused its discretion by drawing unreasonable conclusions based on the record and/or failing to give appropriate weight or analysis to the evidence and testimony presented." Concise Statement of Errors Complained of on Appeal at ¶¶2, 3, 6.

mother's uninterrupted parental role despite the relinquishment of her rights. *See* Appellant's Brief to the Superior Court at i, 2, 21-25. Grandparents, Mother, and Child's counsel each echoed the orphans' court's analysis, arguing Father's lack of effort since 2016, his minimal attempted phone calls, his lack of contact with the child during the six months preceding the filing of the termination petition, his failure to pursue custody sooner, and his own admission he had not been a father to C.M. despite caring for his other children constituted a statutory failure of parental duty and did not demonstrate reasonable firmness to maintain a place of importance in C.M.'s life. In addition, they argued C.M. would not be harmed by the termination of Father's rights because she had no bond with him, and the adoption by Grandparents was in her best interests due to their ability and desire to continue to provide an established, safe, and loving home for C.M. in the event Mother is unable to care for her. *See* Appellee-Grandparents Brief to the Superior Court at 7-9, 11-13; Appellee-Mother's Brief to the Superior Court at 15-18, 20-24, 26-29; Child's Counsel's Brief to the Superior Court at 12-15, 18-20.[5]

---

[5] Following the submission of briefs to the Superior Court, the scheduled oral argument session was canceled due to court closures resulting from the COVID-19 pandemic. Father requested a continuance to reschedule the argument rather than submit the case on briefs. *See* 3060 EDA 2019, Father's Application for Continuance of Oral Argument. Each of the appellees objected to the request, averring all parties had fully briefed the issue, the issue was not novel or unusual, the applicable legal principles are well-settled, and the child's need for resolution of the matter outweighed any benefit of further argument. *See* 3060 EDA 2019, Mother's Answer to Application for Continuance at 2- ("All parties submitted full, substantial, and carefully argued positions and made abundantly clear . . . the legal assertions of each party[;]" the matter "does not raise any novel or unusual issues, is quite similar to other parental termination matters, [and] includes only arguments by parties which have been raised similarly and addressed by this [c]ourt hundreds of times[.]"), Child's Counsel's Answer to Application for Continuance at 2-3 ("It is not in the best interest for the child for there to be any further delay in this matter."), Grandparents' Letter in Lieu of Answer (joining Mother's and Child's Counsel's Answers). The Superior Court denied Father's request and proceeded on briefs. *See* 3060 EDA 2019, Order dated 4/17/2020.

In an unpublished opinion, a divided panel of the Superior Court vacated the order terminating Father's parental rights. *In re Adoption of C.M.*, 3060 EDA 2019, 2020 WL 5269235 (Pa. Super., Sept. 3, 2020) (unpublished memorandum). The panel majority did not address Father's claim the evidence was insufficient to support the involuntary termination of his parental rights, but instead viewed his argument that the termination did not promote the legislative intent of the Adoption Act as implicating a preliminary question of whether a valid proposed adoption was before the orphans' court. *Id.* at *4. The majority regarded the case as "an unrestrained custody dispute that belongs in family court," and opined the termination of Father's parental rights to effect the proposed adoption arrangement was contrary to public policy as articulated in *M.R.D.* *Id.* at *1, *5 n.7.

The majority explained *M.R.D.* involved a similar issue, *i.e.*, the involuntary termination of a father's parental rights to allow the maternal grandfather to adopt the grandchildren he helped to raise, except the unmarried mother in that case sought to retain her own parental rights. *Id.* at *6. The *M.R.D.* Court reversed the termination of father's parental rights, reasoning, in part, "'[t]he purpose behind the termination or relinquishment of an existing parent's rights prior to an adoption is to facilitate a new parent-child relationship between the child and the adoptive parent, and to protect the integrity and stability of the new family unit'" and, "'[t]hus, where no new parent-child relationship is contemplated, the involuntary termination of parental rights is not permitted under the Adoption Act.'" *Id.* at *7 (emphasis omitted), *quoting M.R.D.*, 145 A.3d at 1120, 1127-28. The *M.R.D.* Court additionally commented that permitting the grandfather to adopt and co-parent children as a legal parent along with mother would "open the door

for misuse of adoption proceedings by spiteful parents as a means to involuntarily terminate the rights of unwanted parents[,]" and, "[g]iven that the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, we must ensure that we do not open the floodgates to such gamesmanship." *Id.*, *quoting M.R.D.*, 145 A.3d at 1129. Relying on these statements from the majority opinion in *M.R.D.*, and noting the orphans' court specifically endorsed the credibility of Mother's and Grandfather's testimony — which indicated Mother's parental role would not change as a result of the adoption, and Mother did not consider attempting to terminate Father's parental rights until he attempted to enforce them — the panel majority concluded the termination of Father's rights in anticipation of adoption by C.M.'s grandparents was against public policy pursuant to *M.R.D.*, both because it was gamesmanship triggered by Father's custody claim to exclude Father if Mother's health falters, and because the proposed adoption would not create a new family unit or new parent-child relationship. *Id.* at *5-8, *8 n.9.

Judge Pellegrini dissented, viewing the majority's opinion as improperly adding a public policy requirement to the Adoption Act, specifically, that the proposed adoption must form a "new family unit," where no such requirement appears in the text of the statute. *Id.* at *9, *11, *12 (Pellegrini, J., dissenting). The dissent distinguished *M.R.D.*, observing the discrete issue in that case was whether the mother could be excused from the Act's requirement that her parental rights be terminated in order to free the children for adoption. The dissent noted the *M.R.D.* Court recognized mother had to show the circumstances met the "cause" exception to the Act's requirements pursuant to Section 2901 in order to avoid relinquishing her own parental rights, and the Court determined

cause was not shown. *Id.* at *11; *see* 23 Pa.C.S. §2901 ("Unless the court for cause shown determines otherwise, no decree of adoption shall be entered unless the natural parent or parents' rights have been terminated . . . and all other legal requirements have been met."). Because Mother relinquished her parental rights in this case, the dissent reasoned there was no such defect in the proposed adoption requiring a cause analysis, and considered the majority's requirement of a "new family unit" as improper where the statutory criteria are explicitly met and the adoption petitioners were otherwise entitled to proceed. *Id.* at *12. In addition, noting the orphans' court in the present case found Mother's and Grandfather's reasons for pursuing the adoption to be credible, but found Father not credible, the dissent viewed the majority's analysis as disturbing the lower court's credibility determinations and factual findings in contravention of an appellate court's standard of review, and would have deferred to the orphans' court's findings that the statutory grounds for involuntarily terminating Father's parental rights were met. *Id.* at *13-15.[6]

We granted the petition for allowance of appeal filed by Mother and Grandparents (together, appellants) to consider the propriety of the Superior Court's decision, and specifically to consider whether the panel majority misapplied the holding of *M.R.D.*, or improperly disturbed the factual and credibility findings of the orphans' court to discern the proposed adoption was custody gamesmanship. *In re Adoption of C.M.*, 243 A.3d 970 (Pa. 2021) (*per curiam*).

## II. Arguments

---

[6] Grandparents, Mother, and Child's Counsel each filed an application for reargument before an *en banc* panel, which the Superior Court denied. *See* 3060 EDA 2019, Order dated 10/14/2020 (*per curiam*).

Appellants argue *M.R.D.* involved only "'whether a parent and a grandparent . . . may establish cause under Section 2901 [of the Adoption Act] to waive the requirement that the parent relinquish her parental rights when the grandparent seeks to adopt that parent's children — his grandchildren[,]'" whereas here, there is no request for good-cause relief because Mother voluntarily relinquished her rights and all of the Act's other requirements are met. Appellants' Brief at 22-23 (ellipses added), *quoting M.R.D.*, 145 A.3d at 1127. Further distinguishing their case from *M.R.D.*, in which the Court considered the confusing relationships resulting from the proposed adoption in its refusal to apply the cause exception, appellants argue, here, Grandparents are in a lateral marital relationship, and the adoption does form a new family unit — that is, Mother and Father would no longer have legal ties to the child, and Grandparents become the new legal parents with all the parental rights and obligations that entails. *Id.* at 24-25, 36-40, *citing In re B.E.*, 377 A.2d 153, 156 (Pa. 1977) ("Termination of parental rights permits the child and the adoptive parent or parents to establish a new parent-child relationship **through adoption**.") (emphasis added by appellants). They contend the panel majority's determination below that a new family unit is required by the public policy of the Adoption Act, and was not demonstrated through the proposed adoption by Grandparents in this case, created a new standard that is not part of the statute, is contrary to the Act's pronouncement that "'[a]ny individual may become an adoptive parent[,]'" and constructs a public policy that prevents permanency and stability for children who are already being cared for by their prospective adopters when parental rights are terminated or relinquished, simply because there would be no new family roles formed. *Id.* at 16 (brackets added), *quoting* 23 Pa.C.S. §2312; *id.* at 51. In appellants' view, the panel

majority incorrectly determined custody law should apply to this matter, as their petitions sought a termination of parental rights, not custody, and they were therefore entitled to judgment on the grounds established by the Adoption Act, not the custody statute. *Id.* at 40-44. Appellants further assert the panel majority "improperly ignored and totally disregarded and disturbed the credibility findings of the [t]rial [c]ourt that this adoption was sought for a proper purpose and would promote the child's needs and welfare, all of which is contrary to and beyond the bounds of traditional and longstanding appellate review standards." *Id.* at 45. Reiterating the orphans' court's findings supporting the grounds for termination under the Act's Subsections 2511(a)(1) and (b) — specifically: Father failed to perform parental duties for over two years, Father's explanation was "inadequate and inconsistent[,]" there was no bond between child and Father, the child's needs and welfare were already met by Grandparents and would continue to be met by the adoption, the proposed adoption appropriately provided stability for C.M. given Mother's medical conditions, and that Mother and Grandfather were "credible regarding their reasons for seeking to have the grandparents adopt this child" — appellants argue the Superior Court was required to accept these determinations but the panel majority improperly disregarded them in support of Father's claim the adoption was contrived and inappropriate without addressing the merits of his appeal. *Id.* at 45-49 (appellants' emphasis removed), *quoting* Orphans' Court Opinion, 9/26/2019, at 6, 11.

Child's counsel advances substantially similar arguments on behalf of C.M., agreeing with appellants that the orphan's court specifically and deliberately considered, addressed, and rejected Father's claim the adoption was contrived or pretextual based upon the evidence, and further arguing the panel majority's reversal of that determination

supplants its own interpretation of the significance of Father's custody filing after his lengthy absence, reflecting a departure from judicial standards and undermining the trial court's role as factfinder. Child's Counsel's Brief at 16. Child's counsel asserts the panel's holding sets a problematic precedent which would prevent grandparents or other kinship caregivers from adopting the children in their care if a natural parent whose rights are terminated or relinquished remains involved, impacting not only cases like C.M.'s, but also the myriad of cases involving children whose parents are afflicted by other incapacities such as parental substance abuse, mental illness, incarceration, or domestic violence, or which result from child abuse or neglect. *Id.* at 17-19.

In response, Father acknowledges the ultimate legal issue addressed in *M.R.D.* involved the Adoption Act's cause exception which is not invoked in this case due to Mother's voluntary relinquishment; however, he argues there is otherwise no considerable factual difference due to Mother's admission her maternal role will not change as a result of her forfeiture of parental rights. Appellee's Brief at 10. He characterizes this case as the next step in an evolution of cases striking down one parent's efforts to evade custody court and dispose of unwanted involvement by the other parent. Specifically, Father points to *B.E.*, where an unmarried mother petitioned to terminate the father's rights with no proposed adoption pending, and *M.R.D.*, where an unmarried mother petitioned to terminate the father's rights, while retaining her own, with maternal grandfather as the proposed adoptive co-parent; in both cases, this Court rejected the petitioning parent's attempts, and Father requests we likewise "rebuff Mother's attempt to terminate his parental rights in retaliation for his pursuit of custody and in promotion of an adoption which fails to create any new familial roles or

relationships." *Id.* at 11-13, *citing B.E.*, 377 A.2d at 154-56 (termination of parental rights not permitted where no adoption was pending; purpose of involuntary termination provisions of Adoption Act "is not to punish an ineffective or negligent parent"); *M.R.D.*, 145 A.3d at 1118, 1129-30 (upholding principles from *B.E.*; termination of parental rights not permitted where contemplated adoption did not create new family unit). Noting the panel's reliance on *M.R.D.*'s warning against custody gamesmanship, Father argues such gamesmanship is evident here, where Father not only filed a custody complaint but fully participated in the court's requirements, and Mother's testimony confirmed it was not until he asserted the custody claim that she considered the termination of his parental rights. *Id.* at 12-13, *citing M.R.D.* 145 A.3d at 1129. Recognizing his parental rights are fundamental rights, Father contends the Adoption Act is being used against its purpose here, not for the best interests of C.M., but to punish him for not being a model parent, and to reward Mother for alienating him. *Id.* at 14.

Furthermore, Father asserts the custody gamesmanship he and the panel majority describe would have been thwarted had the orphans' court not erred by concluding there was clear and convincing evidence to terminate Father's parental rights pursuant to Subsection 2511(a)(1) of the Act, which he raised in his appeal below and the Superior Court did not address. He thus argues, even if this Court decides the panel majority erred in its application of *M.R.D.*, the evidence did not support the termination of his parental rights because the orphans' court did not properly consider the obstacles he faced, or his initiation and active participation in custody proceedings as post-abandonment contact. *Id.* at 16-17. He indicates, while the orphans' court may assess the entire history of a case, the most critical period, by statute, is the six months immediately preceding the

filing of the termination petition — during which time his attempts to enforce his parental rights had never been more assertive — yet the court focused on his conduct outside of that period. *Id.* at 17-18, *citing In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999) ("[I]t is the six months immediately preceding the filing of the petition that is most critical to [the court's] analysis" under Subsection 2511(a)(1)). Father argues the orphans' court did not properly consider Mother's intentional obstruction of his relationship with C.M. *Id.* at 19-23, *citing*, *inter alia*, *In re B., N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004), *appeal denied*, 856 A.2d 847 (Pa. 2005) (*per curiam*) ("Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation . . . including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child."); *In re E.S.M.*, 622 A.2d 388, 393 (Pa. Super. 1993) ("[I]f the failure to perform parental duties is the result of obstructive tactics, such failure is excused[;] to obtain the benefit to that excuse, a parent must exhibit reasonable firmness in attempting to overcome the obstructive behavior.") (citations and quotations omitted).

Father further argues his actions and delay in filing for custody "may not be commendable, [but] were reasonable given his circumstances, particularly in light of Mother's resolve to keep Father out of the child's life[,]" as well as his incarceration, hospitalization, inability to have visits with minors at his transitional housing program, and limited income of VA benefits and military disability. *Id.* at 23-25, *citing In re Adoption of C.M.W.*, 603 A.2d 622, 626 (Pa. Super. 1992) (court "cannot sanction termination of the rights of imperfect parents" absent "clear intent to relinquish his rights[;]" court cannot

permit such intrusion into the child's rights, including "the right to know her father with all his flaws") (internal citation, quotation, and brackets omitted).  Finally, Father argues, if his active pursuit of custody is considered to be insufficient effort, this will encourage alienated parents to force themselves into their children's lives using more distasteful methods, *e.g.*, initiating a "custody grab" from school or daycare without the other parent's knowledge.  *Id.* at 27.

## III.  Analysis

A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights.  *In re D.C.D.*, 105 A.3d 662, 667 (Pa. 2014); *Troxel v. Granville*, 530 U.S. 57, 65 (2000), *citing*, *inter alia*, *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923) ("liberty" protected by Due Process Clause includes right of parents to "establish a home and bring up children" and "to control the education of their own").  The time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support.  *See, e.g.*, *In re T.S.M.*, 71 A.3d 251, 271 (Pa. 2013) (children's needs and welfare necessitated termination of parental rights despite strong but damaging bonds).  We readily comprehend the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child.  *See In re P.G.F.*, 247 A.3d 955, 963 (Pa. 2021); *B.E.*, 377 A.2d at 155-56 (purpose of termination of parental rights is to allow for adoption); *see also T.S.M.*, 71 A.3d at 268 (termination of parental rights creates legal orphans).  For these reasons, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of the statutory grounds for

doing so. *Matter of Adoption of G.T.M.*, 483 A.2d 1355, 1356 (Pa. 1984); *In re T.R.*, 465 A.2d 642, 642-43 (Pa. 1983) (applying the standard articulated in *Santosky v. Kramer*, 455 U.S. 745 (1982)). "[C]lear and convincing evidence is defined as testimony that is so 'clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Charles E.D.M.*, 708 A.2d at 91, *quoting Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). Because of this serious impact attending the termination of parental rights, "'it is important that a judicial decree extinguishing such rights be based solely on competent evidence.'" *In re A.J.R.-H.*, 188 A.3d 1157, 1171 (Pa. 2018), *quoting In re Sanders Children*, 312 A.2d 414, 417 (Pa. 1973).

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. *See In re Adoption of L.J.B.*, 18 A.3d 1098, 1107 (Pa. 2016) (Opinion Announcing the Judgment of the Court), *citing Adoption of B.D.S.*, 431 A.2d 203, 207 (Pa. 1981). This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. *See In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012); *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. *See S.P.*, 47 A.3d at 826. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion "only upon

demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. *See id.* at 821; *Atencio*, 650 A.2d at 1066. "We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *T.S.M.*, 71 A.3d at 267. However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *S.P.*, 47 A.3d at 821 (internal citation and quotation omitted).

Subsections 2511(a) and (b) of the Adoption Act set forth the grounds a petitioner must prove in order for the court to grant an involuntary termination of parental rights. *See* 23 Pa.C.S. §2511. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination including, as is relevant herein, the requisite criteria for establishing parental abandonment pursuant to Subsection 2511(a)(1). *Id.* §2511(a). If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in Subsection 2511(a), the court must then consider whether termination would best serve "the developmental, physical and emotional needs and welfare of the child" under Subsection 2511(b). *Id.* §2511(b); *M.R.D.*, 145 A.3d at 1120. Section 2512 sets forth the parties who may file a petition for involuntary termination, including, *inter alia*, a parent, an individual standing *in loco parentis*, or an agency. *Id.* §2512(a). Where a parent or other individual — as opposed to an agency — petitions to terminate the rights of the

child's parent, the petitioner must demonstrate an adoption of the child is anticipated.[7] *See M.R.D.*, 145 A.3d at 1120; *L.J.B.*, 18 A.3d at 1107; *B.E.*, 377 A.2d at 155.

With these settled principles in mind, we turn to the issues presented in the matter before the Court.

## A. *M.R.D.*[8]

As the parties and the opinions of the panel below describe, this Court's decision in *M.R.D.* reversed the involuntary termination of a father's parental rights on the basis the proposed adoption it would facilitate was not a valid one where the unmarried mother petitioning for the termination sought to retain her parental rights and the prospective adoptive parent was the children's maternal grandfather, *i.e.*, the mother's father, who regularly shared parental duties. *See M.R.D.*, 145 A.3d at 1118. In accordance with the

---

[7] Effective December 28, 2020, the General Assembly amended the Adoption Act to provide an additional exception to this rule, not relevant to the present case, which applies when the petitioner is a parent and the child is conceived as a result of rape or incest. *See* 23 Pa.C.S. §§2512(b)(3), 2514.

[8] Initially we note, as explained *supra*, the statement of errors filed by Father pursuant to Pa.R.A.P. 1925(a)(2) did not reference this Court's decision in *M.R.D.* or claim the proposed adoption would not facilitate the creation of a new family unit. Because the orphans' court lacked the opportunity to fairly consider this argument in light of the evidence before it, the specific argument might properly be deemed waived. *See* Pa.R.A.P. 1925(b)(4)(ii) (Statement shall identify each error appellant intends to assert "with sufficient detail to identify the issue to be raised for the judge"), (vii) (issues not included in the Statement are waived); *see, e.g.*, *M.G. v. L.D.*, 155 A.3d 1083, 1092 (Pa. Super. 2017) (same), *appeal denied*, 169 A.3d 522 (Pa. 2017) (*per curiam*). However, because the Superior Court, *sua sponte*, decided only this issue in its reversal of the orphan's court decision, the issue presents a legal question which does not require further factual development, and the issue is now fully and adequately briefed before this Court as a result of our grant of allocatur, we address the panel majority's application of *M.R.D.* in this posture in the interest of expedient clarification of a substantially important issue impacting children awaiting permanency across the Commonwealth.

Adoption Act and settled jurisprudence, the *M.R.D.* Court observed a parent seeking to terminate the rights of another parent must demonstrate a valid adoption is anticipated for the termination petition to be cognizable, and must strictly comply with all pertinent provisions of the Act in order for the adoption to be valid. *See id.* at 1120, *citing B.E.*, 377 A.2d at 155, *In re Adoption of R.B.F.*, 803 A.2d 1195, 1199 (Pa. 2002), *and* 23 Pa.C.S. §2512. Further, the Act requires the petitioning parent to consent to the adoption and relinquish his or her rights, unless the prospective adopter is the petitioning parent's spouse. *See id.* at 1120-21, *citing* 23 Pa.C.S. §§2711, 2903. Where a petitioner does not strictly comply with the Act's requirements but demonstrates cause for noncompliance, the trial court typically has the discretion to enter an adoption decree, pursuant to Section 2901 of the Act. *See id.* at 1121, *citing* 23 Pa.C.S. §2901 ("Unless the court for cause shown determines otherwise, no decree of adoption shall be entered unless the natural parent or parents' rights have been terminated . . . and all other legal requirements have been met."); *R.B.F.*, 803 A.2d at 1201-02. Because the mother in *M.R.D.* wished to be excused from strict compliance with the Act's requirement she terminate her own rights to allow the adoption, and the prospective adopter — her own father — was not (and could not be) her spouse, the sole issue before the Court was whether such a proposed adoption could constitute "cause shown" under Section 2901. *See id.* at 1123, 1127. Despite the orphans' court's specific determination that the proposed adoption of *M.R.D.* was legitimate and in the children's best interests, we held Section 2901 cause could not be shown in such an instance and, therefore, the proposed adoption was not valid, which precluded involuntary termination of the father's parental rights. *See id.* at 1130. In addition to the host of unique legal and practical complications

arising from the situation in *M.R.D.*, we reasoned the purpose of the termination or relinquishment of parental rights requirement is to "'establish a new parent-child relationship through adoption'" and to "protect 'the integrity and stability of the new family unit[,]'" and we further explained the new, single, family "unit" was **one** family involving a horizontal relationship between two parents and freed from the legal encumbrances of the former legal family, which was not the case where the prospective adopter-grandfather would continue to share a separate family unit, with all its appurtenant legal ramifications, with the children's mother through their separate vertical parent-child relationship. *See id.* at 1128-29, *quoting respectively*, *B.E.*, 377 A.2d at 156, *Adoption of J.D.S.,* 763 A.2d 867, 871 (Pa. Super. 2000).

Specifically anticipating a situation such as the one now before us, the *M.R.D.* Court stated, "**[i]f Mother had desired to relinquish her rights** to Children, and assuming *arguendo* that an adoption by Grandfather and the termination of Father's parental rights were in Children's best interests, **Grandfather would be permitted to adopt Children, and termination of Father's parental rights would have been proper, ending our inquiry**." *Id.* at 1126 (emphasis added). In addition, as keenly observed by then-Justice, now Chief Justice Baer in his concurrence, the test requiring a "new family unit" employs "language [ ] not present in Section 2901 or any other provision in the Adoption Act." *Id.* at 1131 (Baer, J., concurring). Furthermore, as we recently explained in *In re Adoption of K.M.G.*, "[i]t is inappropriate and, indeed, unwise for this Court to engage in the judicial creation of what amounts to new statutory duties[;]" and "we must not 'add, by interpretation, a requirement not included by the General Assembly.'" 240 A.3d 1218, 1237 (Pa. 2020), *quoting Commonwealth v. Giulian*, 141

A.3d 1262, 1268 (Pa. 2016). Accordingly, we agree with appellants' contention the Superior Court majority erred in its application of *M.R.D.* Although the new legal parent-child relationship that would be created through the proposed adoption of C.M. by her grandparents, despite the anticipated continuing role of Mother insofar as she is able, appears to meet the parameters of a single new family unit as set forth in *M.R.D.* — indeed, it reflects one of the most relied-upon permanency options for children cared for by kin when parents are incapacitated or unavailable — an assessment for such a component was not relevant here, where Mother voluntarily relinquished her parental rights, the proposed adoption would strictly adhere to the provisions of the Adoption Act, and no cause analysis under Section 2901 is implicated. The Superior Court's scrutiny of the prospective post-adoption family unit for adequate "newness" was therefore erroneous here.

Having determined the panel below improperly applied the *M.R.D.* cause analysis principles in this case, we now consider its invocation of *M.R.D.*'s admonition against gamesmanship. Commenting on the broader foreseeable consequence of allowing the maternal grandfather in *M.R.D.* to adopt and become the legal parent of his grandchildren while his daughter retained her legal parental rights and obligations — when the Adoption Act anticipates a parent's retention of her rights only in an adoption by a spouse — we observed such an exception to the Act's provisions would

> open the door for misuse of adoption proceedings by spiteful parents as a means to involuntarily terminate the rights of unwanted parents, potentially allowing . . . a litany of other individuals who have a close relationship with a child to stand in as prospective adoptive parents so that termination may be achieved. Given that the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, we must ensure that we do not open the floodgates to such gamesmanship.

*M.R.D.*, 145 A.3d at 1129 (internal citations and quotations omitted). The "gamesmanship" of potentially any third party standing in as an adoptive parent, as forecast in *M.R.D.*, is perhaps a more nuanced quagmire than the retributive filing of a termination of parental rights petition described by Father and the panel majority in the present case, but we recognize the danger of approving such petitions filed in the midst of acrimonious custody battles or in short sequence after a non-custodial parent files a complaint in custody, as was the case in *M.R.D.* though it was not then an issue before the Court. *See id.* at 1118; *id.* at 1134-35 (Wecht, J., concurring) (proposed adoption "lacked the required integrity, inasmuch as it appears to have been initiated merely to stave off and defeat Father's claim for custody[;]" custody court has "robust discretionary authority" to limit or curtail a parent's custody rights "without resort to the draconian remedy of termination of parental rights under the adoption laws"); *see also L.J.B.*, 18 A.3d at 1110 (Opinion Announcing the Judgment of the Court) (termination petition filed by parent absent stepparent adoption would provide parents with "a new, and in our view dangerous, tactic in heated custody disputes").

Nevertheless, to the extent the panel majority relied upon aspects of the record not addressed by the orphans' court to conclude the termination and adoption petitions constituted reversible custody gamesmanship — in contravention of the orphans' court's specific determination that credible testimony demonstrated the proposed adoption was not contrived, **and without further analysis** — it did so in error.[9] *See S.P.*, 47 A.3d at

---

[9] However, we also note, to the extent the orphan's court made particular credibility determinations, they related only to Mother's and Grandfather's (credible) testimony "regarding their reasons for seeking to have the grandparents adopt[,]" and Father's (not credible) testimony "that he understood birth mother to question his paternity." Orphans'

826-27 ("[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion."); *Adoption of S.H.*, 383 A.2d 529, 532 & n.2 (Pa. 1978) (task of the orphans' court is to resolve conflicting testimony of witnesses; appellate court may not reweigh the credibility of witnesses).

We acknowledge the solemn reality that a decree terminating parental rights is widely regarded as the civil law equivalent to the death penalty, forever obliterating the fundamental legal relationships between parent and child. *See, e.g.*, *Kimock v. Jones*, 47 A.3d 850, 855 (Pa. Super. 2012) ("termination of parental rights for all practical purposes ends the parent/child relationship as unequivocally as the death of the child") (emphasis omitted); Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook*, "Termination of Parental Rights" at §17.1 (3d ed. 2019) (Termination of parental rights "has often been called the 'death penalty' of dependency court, because of the seriousness and finality of a termination order severing all ties between a child and the biological parents."). Where simultaneously litigated custody matters conjure the specter of gamesmanship in a termination proceeding, such a significant final decree warrants the courts' closest consideration of whether competent evidence clearly and convincingly proves the precise

---

Court Opinion, 9/26/2019, at 6, 11. Thus, the Superior Court appears to have relied upon testimony credited by the orphans' court to reach the opposite conclusion of the orphans' court on the specific issue for which the orphans' court credited the testimony.

elements of the grounds at issue, in a manner "so clear, direct, weighty and convincing" it betrays no hesitance regarding the truth of the facts in issue.[10] *Charles E.D.M.*, 708 A.2d at 91 (internal citation and quotation omitted).

In this case, Father accurately asserts he preserved his claim challenging the sufficiency of the evidence underlying the termination of his parental rights pursuant to Subsections 2511(a)(1) and (b) of the Adoption Act. As this issue was fully briefed and argued by all parties before the Superior Court, but addressed only in dissent, we must now determine whether we should remand to the Superior Court for consideration of Father's sufficiency claim in the first instance, or whether we should resolve it now.

We have explained, appellate review is a review of "the judgment or order before the appellate court, rather than any particular reasoning or rationale employed by the lower tribunal[,]" *A.J.R.- H.*, 188 A.3d at 1176 (internal citation and quotation omitted); therefore, this Court has discretionary authority to affirm an order of a lower court "for any valid reason appearing from the record[,]" *Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1200 (2009). *See also A.J.R.- H.*, 188 A.3d at 1176, *quoting Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("'The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate.'"). Father, as appellee in this Court,

---

[10] Moreover, given the finality that results following the termination of one's parental rights, and given that litigants have used termination proceedings as a strategic tactic in custody proceedings, we take this opportunity to admonish any litigant who engages in such behavior. This type of gamesmanship is intolerable. The use of these tactics should not be cultivated by counsel, and must stop. Courts should not hesitate to impose sanctions on those participating in schemes involving the improper use of termination proceedings.

was not aggrieved by the Superior Court's judgment and was therefore not required to file a cross-petition for allowance of appeal to protect his unaddressed sufficiency claim. *See Lebanon Valley Farmers Bank v. Commonwealth*, 83 A.3d 107, 113 (Pa. 2013) ("Protective cross-appeals by a party who received the relief requested are not favored."). Despite the fact that a considerable portion of Father's present argument is devoted to the sufficiency of the evidence underlying the termination of his parental rights, neither the appellants nor child's counsel submitted a reply brief providing further response to the claim. Moreover, C.M., who was three years old at the onset of this litigation, will be grade-school age by the filing of this decision; we are ever-mindful "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *T.S.M.*, 71 A.3d at 269. Given the complete record forwarded from the court below, the very nature of this case, in which the proper legal status of a child has swayed in the balance for over a third of her lifetime, weighs heavily in favor of a final resolution without further delay.[11] *See R.R.M*, 786 A.2d at 185. We therefore turn to the merits of Father's insufficiency claim.

## B. Sufficiency of the Evidence

---

[11] As described *supra* at note 5, the complete Superior Court record contains appellants' supplementary assurances their responsive arguments to Father's sufficiency claim were fully briefed and involved settled principles such that further argument on the issue was both unnecessary and detrimental to the child. We agree, and for this as well as the aforementioned reasons, we view the record as complete on this issue. Moreover, we are keenly aware of the gravity and time-sensitive nature of the issue, and these are significant factors in our use of the right-for-any-reason doctrine here. *See supra*, slip op. at 29. Notably, a decision to affirm the reversal of a termination of parental rights does not bear the same finality as a decision to affirm the termination itself, as it does not bar the filing of a future petition.

A petitioner seeking to prove grounds for termination under Subsection 2511(a)(1) must demonstrate by competent, clear and convincing evidence, "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. §2511(a)(1).[12]

Though we do not adhere to any strict definition of "parental duty," a child has a right to essential parental care, and our jurisprudence reveals certain irreducible qualities of a parent's attendant obligation. Foremost, it is a positive duty requiring affirmative performance. *In re Bowman*, 666 A.2d 274, 279 (Pa. 1995) (opinion in support of reversal), *quoting In re Adoption of Smith*, 194 A.2d 919, 922 (Pa. 1963). "'[C]ommunication and association are essential to the performance of parental duty[.]'" *In re K.Z.S.*, 946 A.2d 753, 761 n.2 (Pa. Super. 2008), *quoting In re Adoption of Faith M.*, 501 A.2d 1105, 1108-09 (Pa. 1985). "'[P]arental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.'" *In re Adoption of R.W.G.*, 431 A.2d 274, 277 (Pa. 1981), *quoting In re Burns*, 379 A.2d 535, 540 (Pa. 1977) (internal citations and quotation omitted). A parent must "'exercise reasonable firmness'" in resisting obstacles placed in the path of maintaining the parent-child relationship, or his "'rights may be forfeited.'" *S.P.*, 47 A.3d at 828, *quoting In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975). "'Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.'" *In re Adoption of C.J.A.*, 204

---

[12] The law does not require a settled purpose of relinquishing a parental claim **and** a refusal or failure to perform parental duties, but one or the other. *See In re Burns*, 379 A.2d at 539 & n.7.

A.3d 496, 504 (Pa. Super. 2019), *quoting B., N.M.*, 856 A.2d at 855; *Adoption of Smith*, 194 A.2d at 922.

However, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months, the court "must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights]." *Orwick*, 347 A.2d at 680; *see Charles E.D.M.*, 708 A.2d at 92; *Atencio*, 650 A.2d at 1066; *Bowman*, 666 A.2d at 276 (opinion in support of reversal). We have consistently emphasized "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268-69; *see Bowman*, 666 A.2d at 276 n.2 (opinion in support of reversal) (legislature's use of the term "at least six months" indicates evidence of parental conduct preceding the six-month period may be considered), *see also Baby Boy A. v. Catholic Social Services*, 517 A.2d 1244, 1247 (Pa. 1986) ("Once we have determined that the statutory grounds for involuntary termination of parental rights have been proved, it is the child's welfare that is paramount.") (internal citation and quotation omitted). In this vein, a wealth of Superior Court jurisprudence instructs trial courts deciding Subsection 2511(a)(1) cases to consider the whole history of a given case and "not mechanically apply the six-month statutory provision[,]" although "it is the six months immediately preceding the filing of the petition that is most critical to the analysis." *B., N.M.*, 856 A.2d at 855; *see also In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999) (same); *C.J.A.*, 204 A.3d at 504 (same); *In re Adoption of Hamilton*, 549 A.2d 1291, 1294 (Pa.

Super. 1988) ("Pennsylvania courts have wisely refused to apply the statutory six-month requirement mechanically.").

In further consideration of the totality of circumstances, if competent evidence establishes the statutory criteria under Subsection 2511(a)(1), we then require three lines of inquiry: (1) the parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to Subsection 2511(b). *See Charles E.D.M.*, 708 A.2d at 92 (addressing three lines of inquiry and reversing termination of parental rights where record contained no evidence of anticipated effect on children's well-being), *citing*, *inter alia*, *Atencio*, 650 A.2d at 1066-67 (upholding orphans' court's denial of termination of father's rights where mother refused correspondence, gifts, and phone calls from father to child, and would not permit child to visit father along with siblings), *Hamilton*, 549 A.2d at 1295-96 (reversing termination where trial court failed to consider father's legal efforts to enforce visitation for three years following two years of absence, and record did not suggest termination was necessary or served child's welfare). Unlike grounds for termination predicated on incapacity of the parent, the focus under Subsection 2511(a)(1) is not the degree of success a parent may have had in reaching the child, but examines whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship. *See S.P.,* 47 A.3d at 828, 830; *see also In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) ("[W]hile sincere efforts to perform parental duties[ ] can preserve parental rights under subsection [2511](a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection [2511](a)(2).") (internal citation and

quotation omitted); *In Interest of D.F.*, 165 A.3d 960 (Pa. Super. 2017) (same), *appeal denied*, 170 A.3d 991 (Pa. 2017) (*per curiam*); *In re D.J.Y.*, 408 A.2d 1387, 1390 (Pa. 1979) ("A finding of abandonment will[ ] not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.") (internal citations, quotations, and ellipses omitted); *In re M.A.K.*, 414 A.2d 1052, 1054 (Pa. 1980) (termination not warranted where competent evidence supported finding parent's mental health crisis following traumatic event caused temporary failure to perform parental duties); *B.D.S.*, 431 A.2d at 207 (where custodial parent prevents contact, noncustodial parent's performance must be measured in light of what would be expected by an individual under similar circumstances of the parent).

Furthermore, while the inquiry at every step must assess the absent parent's exercise of reasonable firmness to obstacles, we strenuously condemn obstructive conduct by the noncustodial parent seeking termination. *See B.D.S.*, 431 A.2d at 208 ("[O]bstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights."); *S.H.*, 383 A.2d at 532-33 (where evidence showed custodial parent "consistently attempted at all times to prevent the [non-custodial parent] from . . . exercising any parental rights[,]" the fact parent "could conceivably have pursued legal action more promptly cannot justify termination"). Finally, should sufficient evidence not exist to support the necessity of the

termination decree, the trial court will be deemed to have committed an abuse of discretion, thus mandating reversal of the decree. *See Atencio*, 650 A.2d at 1068.

Applying these foundational tenets to the involuntary termination of Father's parental rights, we conclude the orphans' court's decree is not supported by sufficient competent evidence. As described *supra*, the court found Father failed to perform any parental duties for a period of more than six months — for a period of over two years from October 2016 to the date of the filing of the termination petition on April 15, 2019 — concluding "[t]wo isolated phone calls to birth mother in December of 2016 and November of 2017 do not demonstrate that birth father exercised reasonable firmness[,]" and "[a]s a result of father's failure to take further action to have contact with his child, there is no post-abandonment contact with the child for this court to consider." Orphans' Court Opinion, 9/26/2019, at 8, 10. The court drew an analogy to this Court's 1975 decision in *Orwick's Adoption* which, acknowledging the court's obligation to consider the totality of the circumstances, upheld the termination of the parental rights of a father whose extent of contact with the child included only one (returned) gift, two cards, and a $50 savings bond over the course of two years, observing the father had adequate financial means but did not exercise reasonable firmness and failed to support or visit the child for the twenty-two months just prior to the hearing. *Id.* at 9; *see Orwick*, 347 A.2d at 680-81. The orphans' court acknowledged Father's February 19, 2019 attempted phone call to Mother and his subsequent custody petition, but the court ultimately reasoned Father had previously made no written follow up or legal action as a result of his two unsuccessful phone calls in 2016 and 2017. The court thus deemed Father's legal efforts were too

late, as he had "sat on his rights" for more than two years. *Id.* at 11. Our careful review of the record and the relevant law reveals this was error.

Notably, at the time the Court decided *Orwick*, the relevant provision of the Adoption Act enabled involuntary termination of parental rights where the parent's "conduct continuing **for a period of at least six months** either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties[,]" and made no reference to when the six month period was to commence or expire. Adoption Act of July 24, 1970, P.L. 620, 1 P.S. §311(1) (emphasis added). Indeed, much of our case law has developed in response to this particular text, under which grounds for termination exist as the result of **any** six-or-more-month period of parental abdication of duty regardless of when during the child's lifetime it occurred, and thus necessitated the court's consideration of a parent's post-abandonment contact. *See Bowman*, 666 A.2d at 276 n.2. (opinion in support of reversal); *see generally Hamilton*, 549 A.2d at 1295. The General Assembly repealed and replaced that version of the law with the Adoption Act of October 15, 1980, P.L. 934, now codified at 23 Pa.C.S. §2511, and in 1992, further amended the text of Subsection 2511(a)(1) to its current form, enabling involuntary termination of rights when a parent's "conduct continuing for a period of at least six months **immediately preceding the filing of the petition** either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. §2511(a)(1) (emphasis added). This last change qualified the six-month period of abandonment by adding a specific parameter, *i.e.,* "immediately preceding the filing of the petition."

The orphans' court in this case set forth its first critical inquiry under Subsection 2511(a)(1) as "whether the birth father, for a period of more than six months, has failed or refused to perform parental duties." Orphans' Court Opinion, 9/26/2019, at 2. It is clear this was an incomplete statement of the statutory inquiry depicting the text of the prior version of the provision, and further reflects the orphans' court's misguided focus on Father's conduct during the period he was absent, prior to the six months preceding the petition, as well as the court's lack of consideration for his conduct during the period immediately preceding the petition. Appellants urge us to overlook this omission in light of our obligation to avoid mechanical application of statutory time periods. However, where the General Assembly proactively amends a statute and adds an express, unambiguous qualifier to existing criteria, we cannot simply ignore it. *See* 1 Pa.C.S. §1921. Consequently, though orphans' courts assessing evidence under Subsection 2511(a)(1) should not apply the relevant six-month period mechanically — but with an eye to the child's best interests, *see T.S.M.*, 71 A.3d at 268-69, while acknowledging the purpose of the provision is not to punish an ineffective parent, *see B.E.*, 377 A.2d at 154 — we reinforce the view that the six-month period immediately preceding the filing of the petition is the **most** critical period to evaluate for affirmative conduct or its absence, and courts **must** address it. *See C.J.A.*, 204 A.3d at 504-05 ("Because the Adoption Act require[s] the court to focus its attention on the six months immediately preceding the filing of the petition, and because the record supports the court's decision that Father made substantial efforts to perform his parental duties during that time, [p]etitioners are not entitled to relief.").

It is crystal clear, and of vital importance in the present case, that a parent's legal efforts to enforce custodial rights demonstrate affirmative performance of a positive parental duty. For example, in the Superior Court's oft-cited opinion, *Adoption of Hamilton*, a father petitioned the court for visitation following two years of inexplicable absence, which he was granted; he further successfully petitioned to enforce visitation when the mother did not cooperate, and when, two months later, the child's mother filed a petition to terminate the father's parental rights, which was granted, he successfully petitioned to continue visitation pending the termination matter. *See Hamilton*, 549 A.2d at 1295. The Superior Court reversed the decree, viewing the records from the custody court proceedings as evidence of the father's "affirmative demonstration of his intention to assume parental responsibilities[,]" despite his earlier two-year absence, and concluding the orphans' court erred in not evaluating the father's post-abandonment behavior.[13] *Id.* Hence, though an appropriate analysis will differ from case to case, when undertaken in earnest to establish meaningful contact with a child who is otherwise withheld from access by the custodial parent, a noncustodial parent's legal attempts to enforce custodial rights will usually be highly relevant evidence. *See id.* (analysis must also include whether parent's attempt to reaffirm parental duties after a period of absence will be harmful to child); *see also C.M.W.*, 603 A.2d at 622 (reversing termination of parental rights where record contained clear and convincing evidence of parent's

---

[13] Though we approve of *Hamilton*'s analysis regarding its reversal of the termination of parental rights decree on Subsection 2511(a)(1) grounds, we note the case, decided in 1988, is subject to the same shortcomings as *Orwick* and its progeny decided prior to the 1992 enactment of the provision in its current form, that is, at the time, a petitioner established grounds by a showing parental abandonment for any six-month period in the child's life. *See Bowman*, 666 A.2d at 276 n.2 (opinion in support of reversal); *Hamilton*, 549 A.2d at 1294-96; *Orwick*, 347 A.2d 679 n.3, 680.

attempts to locate child through Domestic Relations Office and IRS after custodial parent changed name and moved to unlisted address in another county without notice). Importantly, we are also intensely cognizant of the duplicity enfranchised when a custodial parent's conduct both causes the need for legal intervention and faults the noncustodial parent for failing to take legal action more swiftly, and we are loath to require a parent's prosecution of legal proceedings as a mechanism for preserving parental rights. *See D.J.Y.*, 408 A.2d at 1390 (where absence of communication results from deliberate conduct of the opposing parent, failure to pursue legal action may not be used as a basis for termination of parental rights); *S.H.*, 383 A.2d at 533 ("mere showing that [noncustodial parent] could conceivably have pursued legal action more promptly cannot justify termination").

In this case, two months prior to the April 15, 2019 filing of the termination petition, Father attempted contact, Mother refused, and in response, on February 28, 2019, Father initiated and actively pursued a complaint for custody, seeking a visitation arrangement that could gradually increase to shared custody. Father's perception this action was his only remaining option to establish a relationship with C.M. is buttressed by the orphans' court's recognition of Mother's settled resistance to a relationship between Father and C.M. since his last visit in 2016. *See* Orphans' Court Opinion, 9/26/2019, at 8, 9-10, *supra*. Father attended the court-ordered mediation and conciliation proceedings, suggesting he begin contact gradually, and complied with the court's requirements in the support case until Mother withdrew her complaint. Because no agreement was reached through mediation or conciliation, Father had no contact with C.M. during that time. The custody conciliator issued a report on April 3, 2019, and Father began arranging his

veterans' benefits to secure reunification therapy with C.M. But, before the custody matter and Father's contact with C.M. could progress any further, appellants filed their termination petition.

Thus, consistent with *Hamilton*, despite Father's prior lengthy absence, his proactive participation in the custody court's measured requirements during the time the case was active demonstrates affirmative performance of Father's parental duties to the maximum extent apparent at the time under these circumstances, as well as an interest in and respect for the young child's safety and emotional needs. The orphans' court's finding Father "fail[ed] to take further action to have contact with his child" is not supported by the record, and conflicts with the court's additional finding the action he did take to attempt contact — *i.e.*, pursuing a legal proceeding to enforce his custodial rights — was too late, which conclusion is not supported by the law. Orphan's Court Opinion, 9/26/2019, at 10, 11; *see D.J.Y.*, 408 A.2d at 1390; *S.H.*, 383 A.2d at 533; *Hamilton*, 549 A.2d at 1295. These determinations were therefore erroneous. Consequently, because the record demonstrates Father continuously exercised parental duties during the two months preceding the filing of the petition, appellants did not meet their burden to establish by clear and convincing evidence he failed or refused to perform parental duties, or a settled purpose of relinquishment, for "a period of at least six months immediately preceding the filing of the petition." 23 Pa.C.S. §2511(a)(1); *see C.J.A.*, 204 A.3d at 504-05.

### C. Additional Analytical Observations

Because we conclude the orphans' court failed to consider the requisite statutory period and the evidence during that period does not establish grounds for termination

according to the express requirements of Subsection 2511(a)(1), further review of Father's explanation for his absence,[14] and consideration of C.M.'s needs and welfare pursuant to Subsection 2511(b), are not dispositive and do not compel our result in this case. However, given the rare occasion for this Court to engage in error review of such an important matter, and as a consequence of our broad scope of review, we make the following observations.

Unlike termination of parental rights cases stemming from dependency proceedings — in which the trial court often has observed the parties through multiple hearings over the course of several months or years, and which typically feature the somewhat objective testimony of at least one caseworker whose professional duties include, at a minimum, facilitating parents' visits with the child and documenting parental efforts — when a parent pursues the termination petition as in this case, the record may be wholly comprised of the subjective testimony of one parent against another. Where the interests at stake for each witness are so uniquely fraught, such testimony is qualitatively different from the testimony provided in agency-initiated cases. Indeed, we would not fathom approving the termination of parental rights where an orphans' court described an agency's response to a noncustodial parent's request for contact as it describes Mother's response in this case. Orphans' Court Opinion, 9/26/2019, at 8 ("mother, through her rejection of his requests, contributed to his lack of contact with the child"), 10 ("mother was not cooperative with father and did not make it easy for him to

---

[14] We note that once the grounds are established under Subsection 2511(a)(1), even an incarcerated parent has a duty to utilize those resources at his or her command to continue a meaningful relationship with his or her child, or parental rights may be forfeited. *See S.P.*, 47 A.3d at 828; *McCray*, 331 A.2d at 655.

see this child"); *see, e.g.*, *In Interest of T.J.J.M.*, 190 A.3d 618, 631 (Pa. Super. 2018) (reversing termination of parental rights where, *inter alia*, agency did not provide visits at times parent could reasonably attend). Yet the clear and convincing evidentiary standard remains the same. For this reason, specificity and corroboration are crucial to the foundation of competent evidence.

As one critical illustration, the orphans' court relied on the credible testimony of Mother regarding her medical conditions, which it found were "debilitating and may prove fatal," to conclude the proposed adoption was suited to C.M.'s needs and welfare under these "unusual circumstances." *Id.* at 10; Orphans' Court Opinion, 10/31/2019, at 3. Fully crediting Mother's testimony, as the orphans' court did, establishes only that Mother's understanding of her illness and prognosis — that it might be fatal — was truthful, which is certainly relevant for the court's assessment of her motivations, but not competent to establish the diagnoses and prognosis are accurate or correct, particularly in light of further testimony indicating not much is known about scleroderma, its impact varies, Mother resists researching it, and it currently provides little interference with her ability to care for C.M.[15] Appellants, who bear the burden of proof, offered no corroborating evidence. Credibility is not a substitute for competency. Because we are left to speculate about whether Mother's understanding of her dire ultimate prognosis is in fact correct, and if not, whether the proposed adoption plan remains reasonably calculated to C.M.'s

---

[15] *See* Mother's Testimony, N.T. 7/17/2019 at 36 (Question: "[H]ave you also spent some time doing your own medical research on these kind of conditions?" Answer: "I try not to."), 37 (Scleroderma is "very rare" and not much is published about it; it "usually ends up being fatal within a period of ten years[;]" "I'm aware that many people can be treated for a number of years, but it varies between people."); Grandfather's Testimony, *id.* at 11 ("[Mother]'s doing very well right now. She does all of her duties, schooling, taking care of [C.M.], day-to-day chores.").

needs and welfare, we observe there is significant room to foster hesitancy regarding the orphans' court's conviction of Mother's uncertain future in its conclusion this termination was necessary.

In further contrast to dependency-related termination cases, which involve the ever-looming threat of harm to a child returned to parents who have already demonstrated an inability to provide proper basic care, there is no evidence or argument in this record suggesting any harm might befall C.M. in the event Father's custody case proceeds, or even that her current home environment and routine would change in any way. Unlike a child in foster care, C.M.'s consequence is not zero-sum; she remains with her known family either way, but only one possible outcome to this litigation includes an opportunity to establish a meaningful relationship with her biological father and siblings. *See Hamilton*, 549 A.2d at 1296 (despite prospective second-parent adoption by custodial parent's spouse after father's two-year absence, "nothing in the record . . . suggests that termination of [father's] relationship with his daughter is necessary . . . [o]n the contrary, the record reveals [his] repeated petitions and assertions of visitation rights [with his daughter] have led to the resurgence of their father-daughter relationship"). As Justice Wecht insightfully observed in his concurring opinion in *M.R.D.*, the custody court has robust discretionary authority to enforce the restriction or allowance of contact with Father in a manner curated to C.M.'s best interests. *See M.R.D.*, 145 A.3d at 1134-35 (Wecht, J., concurring). Custody proceedings additionally provide an opportunity to consider objective criteria by which to measure future performance of Father's parental duties should he again disappear from C.M.'s world. Accordingly, we have significant difficulty viewing the evidence in this case as competent to establish the weighty and

consequential conclusion that, faced with the possibility of the loss of Mother at some point in the future, C.M.'s need for permanency requires the termination of Father's parental rights and the severance of his branch of the family tree.  As a further result of our analysis, we strenuously encourage courts to view these life-altering cases through an appropriate lens in light of the substance and objectivity of the evidence presented, and always with an eye toward the individual child's best interests.  *See T.S.M.*, 71 A.3d at 269.

### IV. Conclusion

For the foregoing reasons, we hold the evidence was insufficient to establish the grounds for termination of Father's parental rights pursuant to 23 Pa.C.S. §2511(a)(1). Thus, though we disapprove of the Superior Court's analysis, we reach the same result. The order of the Superior Court is therefore affirmed: the decree terminating Father's parental rights is vacated.  In addition, we vacate the decree terminating Mother's rights by voluntary relinquishment, and return the parties to the status quo ante.[16]  We remand to the orphans' court for proceedings consistent with this opinion.

---

[16] Because we vacate the decree terminating Father's rights, Grandparents' petition for the adoption of C.M. is not cognizable without Father's consent.  *See* 23 Pa.C.S. §§2701, 2702, 2711. As we have described herein, where the petitioner for an **involuntary** termination of parental rights is not an agency, if a valid adoption is not anticipated, the termination petition is not cognizable.  *See M.R.D.*, 145 A.3d at 1120, 1126, *citing* 23 Pa.C.S. §2512(b).  We recognize the public policy of preventing the state's creation of orphans may be just as sound for invalidating a voluntary relinquishment under these particular, aberrant circumstances where, without a valid adoption pending, the purpose of Mother's voluntary relinquishment is vitiated.  *See T.S.M.*, 71 A.3d at 268 (petition to terminate parental rights filed by a biological parent is "only cognizable" when accompanied by valid prospective adoption; "public policy behind this provision is to prevent state-created orphans") (internal citation and quotations omitted); *see also* Petition for Voluntary Relinquishment of Parental Rights of [B.M.] at ¶7 ("Your petitioner intends to relinquish her parental rights only in connection with the adoption of the child by her parents, [D.M.] and [P.M.].").

Chief Justice Baer and Justices Saylor, Donohue and Mundy join this opinion.

Justice Todd files a concurring and dissenting opinion.

Justice Wecht files a concurring and dissenting opinion.