# Lanning Will.

Argued October 11, 1963.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and ROBERTS, JJ.

*Dale T. Lias,* for appellant.

*Clyde E. Donaldson,* for appellee.

OPINION BY MR. JUSTICE JONES, May 11, 1964:

This appeal challenges a decree of the Orphans' Court of Allegheny County which dismissed an appeal from a decree of the Register of Wills admitting to probate a holographic writing dated September 4, 1954, as the last will of Charles S. Lanning (decedent).

Decedent, 93 years of age, died on August 26, 1960. On December 1, 1960, decedent's lawyer-prepared typewritten will dated April 13, 1951, was admitted to probate. Three months later, George Moehring (Moehring), sole beneficiary under the holographic writing of September 4, 1954, appealed from the probate of the 1951 will. Moehring's appeal was sustained by the Orphans' Court of Allegheny County, and the Register of Wills was authorized to entertain an application to probate the 1954 will; thereafter, the 1954 will was duly probated. Shirley L. Lober, decedent's niece and residuary legatee under the 1951 will, then appealed to the Orphans' Court alleging (a) the 1954 will had been obtained through fraud, duress and undue influence exerted upon decedent by Moehring and his wife, (b)

the said will was a forgery and (c) decedent lacked testamentary capacity.[1]

After hearing testimony, the court upheld the 1954 will and dismissed the appeal. From that decree this appeal was taken.

Decedent, for many years a manufacturer's agent acting principally for E. L. Post & Co., Inc., of New York (Post), retired sometime in 1954. Decedent lived in a home operated by a Mrs. Helen Wunderlich at 210 North Bellefield Avenue, Pittsburgh, from 1942 until either August or October of 1954 at which time he moved to a nursing home operated by Moehrings in Pittsburgh. Decedent's nearest relatives were Shirley Lober, the contestant, and the Misses Bulette, cousins living in York, Pa.

In passing upon the issues raised upon this appeal, we recognize that the findings of facts of the chancellor, who heard the testimony without a jury, approved by the court en banc, are entitled to the weight of a jury's verdict, that such findings are controlling and that the court's decree should not be reversed unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence: *Masciantonio Will*, 392 Pa. 362, 367, 141 A. 2d 362, and cases therein cited.

This will contest presents several unique features: there is evidence (1) that on November 3, 1954, decedent was adjudged mentally incompetent and a guardian appointed for him, (2) that several guests in Moeh-

---

[1] On November 1, 1961, a petition was presented to the Register of Wills to show cause why Moehrings should not be required to produce a third will allegedly in Moehrings' possession. The Register certified this matter to the Orphans' Court. That court was requested to try the issue of this later will at the same time as the trial of the validity of the 1954 will. The court denied this request and dismissed the petition.

rings' nursing home had been subjected to some influence to make wills favoring Moehrings, (3) that the disputed will leaves decedent's entire estate to Moehring, a stranger to the blood whose pre-will acquaintance with decedent is severely challenged and (4) that two of contestant's witnesses whom the chancellor characterized as "honest, disinterested and forthright" were ultimately and without apparent reason discredited by the chancellor in reaching his determination.

As we read this record we cannot fail to note the scant consideration afforded by the chancellor to two vital factors, i.e., the establishment of the date of execution of this will and the effect of decedent's adjudication as an incompetent upon the issue of testamentary capacity. In the case at bar, it is most important the *actual date* of execution of this will be ascertained. Its importance is two-fold: (a) it is decedent's testamentary capacity *on that date* which determines the will's validity (*Williams v. McCarroll*, 374 Pa. 281, 293, 97 A. 2d 14; *Masciantonio Will*, 392 Pa. 362, 384, 141 A. 2d 362); (b) whether execution preceded or followed the incompetency adjudication of November 3, 1954 determines whether the burden of proof as to testamentary capacity or lack thereof is upon proponent or contestant.

To establish execution of this will on September 4, 1954, proponent produced the testimony of the two subscribing witnesses, Jo Evelyn Johnston and Robert Johnston, her husband.[2] "The testimony of the subscribing witnesses is that on the evening of September 4, 1954, they and their two young children went to the

---

[2] Robert Johnston testified only at the preliminary hearing at which the court determined a prima facie case had been established to justify opening of the probate of the 1951 will. Robert Johnston did not appear at the hearing before the court on the appeal from the probate of the will and the court, in its opinion, refers to the testimony of Robert Johnston given at the preliminary hearing.

Moehring home to visit the decedent. The decedent was in the kitchen when they arrived and was writing at a table. The subscribing witnesses testified that they did not see Mrs. Moehring on the premises on this occasion and that Mr. George Moehring, the proponent of the will, was in the yard cutting the grass."[3] Mrs. Johnston testified she was present when decedent signed the will, saw him sign his name and at decedent's request she signed her name in his presence and that of her husband. Mr. Johnston testified he saw his wife sign her name in decedent's presence, that he saw decedent sign his name, that he signed his name at decedent's request and, after the will was signed, he read the will.[4] These witnesses fixed the *date* of execution as September 4, 1954, and the *place* of execution as Moehrings' home. If decedent was not living in Moehrings' home on September 4, 1954, Johnstons' testimony falls. Moehrings, deeply interested witnesses, stated decedent came to their home to live on August 10, 1954. The crux of this controversy is where decedent was living on September 4, 1954.

To prove decedent was not living in Moehrings' home on September 4, 1954, and did not begin to live there until October 6, 1954—*32 days after the date of the alleged will*—contestant produced two witnesses, W. L. Vaughan, President of Post (decedent's principal customer) and Mrs. Wunderlich in whose home decedent had lived for approximately 12 years. Vaughan produced a letter addressed to him by decedent dated September 15, 1954, wherein decedent states, inter alia, that he will be "compelled to give up my room at 210 Bellefield [the Wunderlich home] in a few days

---

[3] From the opinion of the court below.

[4] Johnstons testified decedent was of sound mind on September 4, 1954. However, Mr. Johnston stated: "If you had asked me, then are you sure it was September 4, 1954 . . . to be honest I would have said 'no'."

and I have no place to go." The contents of this letter place decedent in the Wunderlich home *11 days after the alleged date of execution of the will in Moehrings' home and 36 days after Moehrings testified decedent had moved to their home.* Highly significant in Vaughan's testimony is his account of a conversation with an Attorney Victor Baker[5] on or about March 23, 1960, in Pittsburgh. According to Vaughan, Attorney Baker told him that decedent had made a will and "cleverly predated the will [i.e., predated it so that it would appear to have been executed prior to the incompetency adjudication] so that it could not be contested."[6] Baker testified that the "substance" of Vaughan's memorandum "is reasonably accurate" although the "wording" did not sound "like it is accurate" and he repeated "that was the gist and substance of our conversation", although he questioned the "accuracy of the exact words" used.

Mrs. Wunderlich testified that in the fall of 1954 it was necessary that she go to the hospital to undergo surgery and, as a result, she was unable to take care of decedent. While endeavoring to locate a place for decedent to live, she noted in a newspaper an advertisement of Moehrings' nursing home.[7] Following this advertisement, on September 30, 1954, Mrs. Wunderlich called Mrs. Moehring and, on October 4, 1954, took decedent to see Moehrings' home. On October 6, 1954, 32 days after the alleged execution of the will in Moeh-

---

[5] Attorney Baker, Moehrings' lawyer and, apparently, decedent's lawyer after decedent went to live with Moehrings, also figured in incidents in connection with other guests in Moehrings' home related, infra.

[6] After this conversation, Vaughan went to his hotel and made this memorandum: "March 23rd, 1960 4:15 P.M. Baker to Vaughan, Regarding his will, Mr. Vaughan, Lanning knew he had been declared incompetent and cleverly predated the will so that it could not be contested . . . ." This memorandum is in evidence.

[7] This advertisement was received in evidence.

rings' home, Mrs. Wunderlich accompanied decedent when he then moved to Moehrings' home. Mrs. Wunderlich produced records which indicate that decedent paid rent at her home from September 15, 1954, to October 15, 1954, and that Dr. Kretz, decedent's physician, visited decedent at the Wunderlich home on September 9 and September 23, 1954.[8]

*The chancellor, who saw and heard these witnesses, in his opinion said "Mrs. Wunderlich and Mr. Vaughan were honest, disinterested and forthright witnesses".* Having thus placed his imprimatur on the credibility of these witnesses, the chancellor's subsequent repudiation of their testimony, without any apparent or assigned reason, is beyond comprehension. If the *"honest, disinterested and forthright"* Mrs. Wunderlich is to be believed, decedent could not have been living in Moehrings' home on September 4, 1954. Nevertheless, the chancellor accepted Johnstons' and Moehrings' testimony that decedent was in Moehrings' home on that date.[9] With all due respect to the chancellor—an able, experienced and upright jurist—his ultimate treatment of the testimony of Vaughan and Mrs. Wunderlich—the "honest, disinterested and forthright" witnesses—amounted to a capricious disbelief of their evidence. Once having stated these witnesses were believable, the chancellor, without reason, could not then proceed to disbelieve them. In so doing, the chancellor erred and his error is of such importance as requires a reversal of his action.

Moreover, in his opinion, the chancellor observed that the accuracy of the date of September 15, 1954, in the decedent-to-Vaughan letter would have been sub-

[8] Dr. Kretz had no records available.

[9] Moehrings obviously are *interested* witnesses. While it was for the chancellor, not us, to pass upon credibility of witnesses, including their interest or lack thereof, the testimony as to interest on Johnstons' part is strong.

stantiated by the production of Vaughan's letter of September 13, 1954, to decedent or the check referred to in such letter but that such substantiation had not been produced. Yet, when sometime after the testimony was closed, contestant requested the chancellor to receive further evidence, allegedly found, post-hearing, in old files of Vaughan and Post, which would have substantiated the date of September 15, 1954, the court refused such request. Such evidence was as follows: (1) a cancelled check dated September 12, 1954 from Vaughan to decedent of which the decedent speaks in his letter of September 15, 1954; (2) a letter written by decedent from 210 Bellefield Avenue on August 26, 1954, to Post; (3) a carbon copy of a letter dated August 23, 1954, from Vaughan to decedent, addressed to 210 Bellefield Avenue, wherein Vaughan enclosed two checks of which decedent acknowledged receipt in the letter of August 26, 1954; (4) two cancelled checks, dated August 23, 1954, from Post, Inc. sent to decedent at 210 Bellefield Avenue, which were acknowledged by decedent's letter of August 26, 1954; (5) a letter dated October 9, 1954 from decedent to Post stating decedent had *now* secured another room; (6) a letter from Mrs. Wunderlich, dated October 11, 1954, to Vaughan telling him she had "finally" found a room for decedent. Such evidence should have fully satisfied the chancellor's search for substantiation of the accuracy of the date in the decedent-Vaughan letter and also would have materially aided in answering the very crucial question where decedent was living on September 4, 1954. Without even requiring proponent to answer contestant's request, the chancellor denied the request to present this evidence. Our examination of the proffered evidence indicates such evidence should have been received as it satisfied the ordinary criteria for the production of newly discovered evidence: *Hornick v. Bethlehem Mines,* 310 Pa. 225, 228, 165 A. 36;

*Higbee v. Koziol,* 383 Pa. 116, 119, 117 A. 2d 707; *Helmig v. Rockwell Manufacturing Co.,* 389 Pa. 21, 26, 131 A. 2d 622. Under the circumstances, the refusal of the chancellor to receive this evidence constituted an abuse of discretion.

Appellee argues that the exact date of a will is not essential to its validity and that an erroneous date will not vitiate the instrument, relying on *Bates's Estate,* 286 Pa. 583, 134 A. 513, and *Baum's Estate,* 269 Pa. 63, 112 A. 141. We have no quarrel with *Bates* or *Baum*; however, both are presently inapposite in this respect. In the case at bar *the date of the will is of crucial importance.* If the date of this will is not established with some certainty, how can the testamentary capacity or lack thereof *at that time* be established? Likewise, how can the impact of decedent's adjudication of incompetency on proof of his testamentary capacity be evaluated?

An adjudication of mental incompetency made prior to the execution of a will does not command the conclusion that such will is invalid for lack of testamentary capacity: *Leckey v. Cunningham,* 56 Pa. 370; *Hoopes' Estate,* 174 Pa. 373, 34 A. 603; *Hoffman's Estate,* 209 Pa. 357, 58 A. 665; *Sterrett's Estate,* 300 Pa. 116, 150 A. 159. However, where a person is adjudicated to be a mental incompetent and thereafter, during the pendency of such adjudication, executes a will, the burden is shifted to the proponent of the will to show that *at the time the will was made* such person possessed testamentary capacity: *Harden v. Hays,* 9 Pa. 151; *Titlow v. Titlow,* 54 Pa. 216; *Hoopes' Estate,* supra; *Brennan's Estate,* 312 Pa. 335, 339, 168 A. 25; *Mohler's Estate,* 343 Pa. 299, 305, 22 A. 2d 680; *Girsh Trust,* 410 Pa. 455, 468 (footnote), 189 A. 2d 852.

In *Baum,* this Court said there was a presumption that the date inserted by a testator himself on a will is the correct date and that such presumption could

only be overcome by "clear, precise and indubitable evidence of mistake".[10] (p. 66). The chancellor concluded that the date of this will was September 4, 1954. In so doing, we assume, he applied the presumption noted in *Baum*, as well as Johnstons' testimony. However, in the case at bar, we have a factual situation unlike that in *Baum* inasmuch as here we have an admitted adjudication of decedent as an incompetent. Under such circumstances, it is highly questionable whether the presumption noted in *Baum* should arise until proponent has first proven that the insertion of the date by the testator took place prior to his adjudication as an incompetent. Even so, even though the presumption in *Baum* were presently applicable, has not such presumption been overcome by the "honest" testimony of Vaughan and Mrs. Wunderlich? Accepting September 4, 1954 as the date of execution of this will, the chancellor failed to consider whether the testimony of Vaughan and Mrs. Wunderlich did not qualitatively satisfy the rule in *Baum* as to the testimony requisite to rebut the presumption.

Without having fixed with any degree of certainty the date of execution of this will as prior to the adjudication of incompetency, the court evaluated the evidence on the basis of the rules applicable only to a pre-adjudication execution of a will, i.e., that testamentary capacity is to be presumed and that the burden of proving lack of testamentary capacity is upon contestant. Such was clearly error. The evidence must, and does not, fix the date of execution of the will with relation to the date of adjudication of incompetency with some degree of certainty; unless and until such date is fixed the court was not in a position to determine upon whom rested the burden of proof.

On the question of testamentary capacity, the matter must be remanded to the court below for the pur-

---

[10] Should be "clear, precise, direct and convincing".

pose of (a) receiving the proffered newly discovered evidence, (b) establishment of the date of execution of this will as *before or after* the date of adjudication of incompetency and (c) after such date is established, a reconsideration of the evidence then of record.

In view of our conclusion that this matter must be remanded to the court below for the reception of the additional evidence and a reconsideration of the thus augmented record, it might not be amiss to note the presence in this case of a concatenation of circumstances which, at the very least, in the words of the court below "cast a shadow of suspicion" on this will. The Knox, Lunt and Luse incidents—all introduced into evidence to show a course of conduct and a pattern of behavior of Moehrings vis-a-vis other aged guests in their home[11]—present grave questions which demand close scrutiny and investigation, questions which conceivably could raise more than mere suspicion and conjecture of undue influence.

Nursing homes have become commonplace, and the vast majority of the operators thereof are honest and highly scrupulous persons. Nevertheless, we must recognize that the aged and the infirm in such homes, most naturally, become greatly dependent on the care and ministration of those in charge of such homes. It could well be that, in the hands of unscrupulous persons, such dependence could well be utilized to improperly influence the aged and infirm in the post-mortem disposition of their property. To the possibility of such danger courts charged with the administration of decedents' estates must ever be alert.

In the case at bar, against the background of the Knox, Lunt and Luse incidents and in view of the serious challenge made by contestant to the duration of

---

[11] The question of the admissibility of this evidence is not at issue.

even an acquaintance of Moehrings with decedent[12]—even under the testimony most favorable to Moehrings, decedent was in Moehrings' care but 25 days when he made this will—, one must naturally inquire *why* this decedent should make Moehring, a stranger to the blood, the sole beneficiary to his estate. We fully recognize that suspicion and conjecture do not take the place of proof, yet we believe that the instant circumstances require the most thorough of inquiry and the closest of scrutiny.

Crucial in this will contest is the ascertainment of *when* this will was made. An answer to this question may well cause all the other pieces of this unique puzzle to fall into place.

Decree reversed and the matter remanded to the court below for proceedings consistent with the views expressed in this opinion.

Mr. Chief Justice BELL concurs in the result.

Mr. Justice O'BRIEN took no part in the consideration or decision of this case.

---

[12] In addition to the newly discovered evidence referred to in this opinion, contestant endeavored to show other newly discovered evidence to the effect that a nursing home on Negley Avenue, Pittsburgh, had not been purchased by a Mrs. Gleason until March, 1947. The importance of this was to discredit Moehrings' story that they *first* met decedent at Gleason's nursing home when decedent's brother was a guest therein and when Mrs. Moehring worked there. The evidence which contestant was not permitted to show would indicate decedent's brother died prior to opening of the Gleason home and that Mrs. Moehring never worked there.