383 A.2d 529

**ADOPTION OF S. H.**

**Appeal of J. S.**

Supreme Court of Pennsylvania.

Argued Sept. 27, 1977.

Decided March 23, 1978.

Fred J. Sentner, Canonsburg, for appellant.

Arnold M. Epstein, Neighborhood Legal Services, Pittsburgh, Richard P. Gilmore, Washington, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant, J.S., natural mother of S.H. (son), appeals from the decree of the Orphans' Court Division of Court of Common Pleas refusing to terminate the parental rights of appellee W.H., natural father of the son.[1] Appellant petitioned the orphans' court alleging that the father "for a period in excess of six (6) months, has refused and failed to perform parental duties with respect to said child and by his conduct, has evidenced a settled purpose of relinquishing parental claim to the child." See the Adoption Act, Act of July 24, 1970, P.L. 620, § 311(1), 1 P.S. § 311(1) (Supp.1977). The orphans' court denied the petition on the grounds that "the testimony indicates that the father has affirmatively performed his parental responsibilities as best he could do under the circumstances," and the "totality of circumstances in this case establishes the father wanted to remain as a positive force in his son's life but was thwarted in his efforts by his former wife, her new husband, and her mother." We affirm.

A parent will not be found to have "failed" or "refused" to perform parental duties, or to have "evidence[d] a settled purpose of relinquishing parental claim to the child," id., so long as he or she "use[s] all available

---

1. Pursuant to Orphans' Court Rule 15.7(c), we have deleted the names of those involved.

We hear this appeal pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1977).

resources to preserve his parental relationship" and " 'exercise[s] reasonable firmness "in declining to yield to obstacles" . . . .' " *Adoption of M.T.T.*, 467 Pa. 88, 96, 354 A.2d 564, 568 (1976), quoting *Adoption of McCray*, 460 Pa. 210, 216, 331 A.2d 652, 655 (1975), and *Adoption of J.R.F.*, 27 Somerset L.J. 298, 304 (Pa.C.P. Orph.Div.1972).

Appellant contends that the findings of the orphans' court are not supported by evidence in the record, the evidence believed by the orphans' court was not credible, and the facts found do not justify the conclusion that the father used all available means to preserve his relationship with his child.

■■■■ The findings of the orphans' court, supported by competent evidence, "must be sustained unless the court abused its discretion or committed an error of law." *In re William L.*, ── Pa. ──, ──, 383 A.2d 1228, ── (1978); accord, e. g., *Wertman Estate*, 462 Pa. 195, 340 A.2d 429 (1975); *Estate of Lanning*, 414 Pa. 313, 200 A.2d 392 (1964). We must accept as true all evidence in the record supporting the findings of the court and reasonable inferences therefrom. E. g., *In re William L.*, ── Pa. at ── and n. 12, 383 A.2d 1228 and n. 12; see *Kay v. Kay*, 460 Pa. 680, 334 A.2d 585 (1975). Conflicts in the testimony are to be resolved by the trier of fact, who is the sole judge of credibility. E. g., *Garges Estate*, 474 Pa. 237, 378 A.2d 307 (1977); *Wertman Estate*, supra. This Court may not disturb a decree of the orphans' court based upon findings supported by the record unless the orphans' court applied an incorrect legal standard. See, e. g., *In re William L.*, supra; *Garges Estate*, supra; cf. *Girard Trust Bank v. Sweeney*, 426 Pa. 324, 330, 231 A.2d 407, 411 (1967) (decision reversed where facts properly found did not meet applicable legal standard).

The orphans' court found:

"The petitioner [J.S.] is the natural mother of the subject of this litigation, the child, [S.H.]. The respondent, [W.H.] is the natural father of [S.H.]. [S.H.] was born on January 7, 1971, and his natural parents were married at the time of his birth. In January of 1973, the

mother of said child left the father taking with her the child, [S.H.] and all of the household furnishings. At the time of this separation, the husband was working and was attempting to support his wife and child. When the mother left the father in January of 1973, she did not leave a forwarding address and did not leave any information as to where he could find his wife and child. The father made an attempt to find the mother and the child by asking a friend, . . . to help him find them and further, he telephoned his wife's mother, Mrs. [D.] in March, April and May in order to locate his wife and child. Mrs. [D.] would not help him and informed the father that she did not know where her daughter was and that she wouldn't tell him if she did know. In addition, Mrs. [D.], the father's mother-in-law, threatened to have him arrested and placed under a peace bond if he continued to make telephone calls. Inasmuch as Mrs. [D.] had previously obtained a peace bond on the father, the father refrained from making additional calls and from May of 1973, until September, 1973, he had his friend or his grandmother place calls to Mrs. [D.] inquiring as to the whereabouts of his wife and child.

In September, 1973, the husband met his wife on five different occasions and gave her money on each occasion and he was assured by the mother of the child that she would allow the child to visit the father. When it became evident that the mother was not going to allow the visits of the child with the father, the meetings ceased. In November and December of 1973, the father called his wife on several occasions and was permitted to talk to the baby. Further, the father continued to request visitations but the mother refused to allow the same. At Christmas in 1973, the father delivered gifts for his child consisting of clothes and Tonka trucks. These gifts were left at the home of his mother-in-law, Mrs. [D.], who accepted the gifts on behalf of the child. In January of 1974, the wife divorced the husband and at that time the husband-father was incarcerated at the Allegheny County Jail. The father was in the Allegheny County Jail from January, 1974,

until June of 1974. In February of 1974, while still incarcerated in the Allegheny County Jail, the father requested his attorney . . . to obtain information as to visitation rights to his son. Further, while the father was in jail, he sent approximately 30 letters to his mother-in-law's home inquiring about the welfare of his child plus birthday and Easter cards were sent to the child. He also requested a photograph of his child. Although a return address was on all of the letters that were sent to his former mother-in-law's address, none of the letters were returned and the father received no response to his letters until June of 1974 when he received a threatening letter from [G.S.], who was then his former wife's fiance. At this time [G.S.] informed the father that he would not permit the former wife to bring the child . . . to visit the father. The father responded to [G.S.]'s letter by a letter informing [G.S.] that he was concerned about his son and he intended to obtain visitation privileges. From June, 1974, through March of 1975, the father was then incarcerated in the State Correctional Institution at Huntington. Due to regulations at the Institution, the father was not allowed to make calls to his son. At Christmas of 1974, the father sent his son a Christmas card and directed one of his friends to take gifts to his son. In addition, the father requested his Parole Officer . . . to make arrangements for visitation with his son. In January and February of 1975, he wrote letters to his former wife offering to pay support for his son if and when he was released from prison and he also requested his former wife to allow him visitation rights to see his son. In March of 1975, the father was released from Huntington and in the months of April and May, he called his former wife on a number of occasions in order to contact his son, but the former wife would hang up on him.

In June of 1975, the father was again incarcerated, but in this instance at the State Correctional Institution at Pittsburgh. In September of 1975, the father requested his fiancee . . . to call the mother to inquire about his son and further he requested her (his fiancee) to get

photographs of the son and try to arrange a visitation. The fiancee . . . did make telephone calls in September and October to the mother of the child, but they were to no avail. In the first or second week of November, 1975, the father met one [N.P.] of the American Red Cross and requested his assistance in obtaining visitation rights with his son. On December 2, 1975, [N.P.] received a written letter from the father again requesting help in obtaining a visitation with his son. On December 12, 1975, Mr. [P.] attempted to contact the mother through her father and on December 15, 1975, the mother called Mr. [P.] by telephone and told him that she was going to terminate the father's parental rights to his child by a legal proceeding. On December 18, 1975, Mr. [P.] related to the father his conversation with the father's former wife and explained to him that the wife intended to institute a proceeding to terminate his parental rights. In December of 1975, the father again sent Christmas gifts and cards to his son. The father appeared to the Court to be a very sincere witness and announced his willingness to pay support for his son to the extent that he is able.

Further, the Court finds as a fact that the mother of this child has consistently attempted at all times to prevent the father from visiting with said child and/or from exercising any parental rights of any nature to said child."

■ Appellant argues that two facts found by the orphans' court are not supported by the record. The orphans' court found that, "in November and December of 1973, the father called his wife on several occasions and was permitted to talk with the baby." Appellant correctly points out that the father testified that he was permitted to talk to his son only once during these months. This discrepancy is irrelevant. The issue is whether the father used all resources available to contact his son. That the mother refused any or all of the father's calls does not detract from the father's attempts to communicate with his son. Similarly, appellant argues that the orphans' court erred in finding that "in the months of April and May [1975], [the father] called his

former wife on a number of occasions in order to contact his son, but the former wife would hang up on him," when the record shows only two such calls. Assuming that two calls do not amount to "a number of occasions," the record as a whole still supports the conclusion of the orphans' court.

■ Next, appellant argues that the trial court abused its discretion by believing all the testimony of the father, who has a criminal record, and by disbelieving all the contradictory testimony of appellant and her mother, the son's grandmother. We disagree. The determination of credibility is solely for the trier of fact. E. g., *Garges Estate*, supra (conflicting evidence of common law marriage); *Wertman Estate*, supra (chancellor believed lay testimony over conflicting expert testimony). It was the task of the orphans' court to resolve the conflicting testimony of these witnesses. Therefore, the orphans' court did not abuse its discretion by crediting the testimony of the father.[2]

■ Finally, appellant contends that, because the father did not promptly take legal steps to ensure visitation rights, the findings do not justify the conclusion that the father used "all available resources" to overcome hinderances to a relationship with his child. We disagree. The father's course of conduct during the period in question consistently aimed at maintaining his relationship with his son. The father's extended attempts to locate his son after his wife left him, to persuade the mother to permit visitation, to send letters and gifts from prison to his son, to arrange for visitation through his new fiancee, along with the other efforts found by the orphans' court, demonstrate the "reasonable firmness 'in declining to yield to obstacles . . .' " which will preserve parental rights. *Adoption of McCray*, 460 Pa. at 216, 331 A.2d at 655. Compare *Adoption of M.T.T.*, supra (incarcerated father diligently pursued rela-

---

**2.** Any inference from *Estate of Button*, 459 Pa. 234, 328 A.2d 480 (1974) or *Estate of Lanning*, 414 Pa. 313, 200 A.2d 392 (1964) (abuse of discretion where orphans' court without reason disregarded testimony of witnesses it expressly found "honest, disinterested and forthright"), that an appellate court may reweigh the credibility of witnesses cannot be accepted.

tionship with his child), with *Adoption of McCray* (father's imprisonment did not excuse failure to use available resources to maintain relationship with his child). In these circumstances, a mere showing that the father could conceivably have pursued legal action more promptly cannot justify termination of the father's rights. See *Adoption of McAhren*, 460 Pa. 63, 72 & n. 5, 331 A.2d 419, 423 & n. 5 (1975).

Decree of the orphans' court affirmed. Each party pay own costs.

NIX, J., concurs in the result.

PACKEL, J., did not participate in the decision of this case.