J-A04004-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: P.M., IV., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L., MOTHER | : : : : : : | |
| | : | No. 1448 MDA 2022 |

Appeal from the Decree Entered September 14, 2022
In the Court of Common Pleas of York County
Orphans' Court at No:  2022-0002a

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY STABILE, J.:                    **FILED MAY 25, 2023**

S.L. ("Mother") appeals from the September 14, 2022 decree, in the York County Court of Common Pleas, granting the petition of A.M. ("Paternal Aunt"), terminating involuntarily her parental rights to her minor son, P.M., IV ("Child"), born in August 2017, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b).[1]  After careful review, we reverse in part and remand to the orphans' court.

Child has resided in Paternal Aunt's physical custody since September 2020, as a result of Paternal Aunt initiating a custody action against Mother and Father (collectively, "Parents"), who struggled with alcohol abuse and

---

[1] By the same decree, the court involuntarily terminated the parental rights of Child's father, P.M., III ("Father").  Father did not file a separate appeal or otherwise participate in the instant appeal.

mental illness, respectively.[2]  *See* N.T., 7/22/22, at 53, 56-57; *see also* N.T., 5/20/22, at 79, 82.  Paternal Aunt was temporarily awarded physical and legal custody of Child, with supervised visitation awarded to Parents.  *See* N.T., 7/22/22, at 52-53; *see also* N.T., 5/20/22, at 82.  By final order dated March 5, 2021, the court maintained physical and legal custody with Paternal Aunt.  Parents were awarded a total of one supervised visit per week for two to four hours[3] and virtual or phone contact two times per week for no more than 30 minutes each time.  The court further found Parents presented a threat of harm to Child.  Mother's Exhibit 27; *see also* N.T., 7/22/22, at 11, 52-53.

After suffering a relapse with respect to her alcohol addiction and re-entering in-patient rehabilitation in Florida in April 2021, Mother returned to her parents' home in Pennsylvania on July 3, 2021.  *See* N.T., 7/22/22, at 64-65, 99-100, 138.  Mother then sought to again exercise her custodial rights to virtual calls and visitation on July 22, 2021.  *See* N.T., 7/22/22, at 65; *see*

---

[2] Prior to this time, Child was in the custody of Parents collectively, and then Father.  *See* N.T., 7/22/22, at 118-19.  Mother testified that, in November 2019, she entered an in-patient rehabilitation program for alcohol abuse in Florida for a period of nine months, followed by residence in a sober living home.  *Id.* at 56.  She stated, "I knew that my mom . . . struggled with it, so it was something that I was aware of. . . .[A]lso[,] . . .[the] separation between [Father] and I was fairly new and I wanted to be sure I could show up for [Child] to the best of my ability."  *Id.* at 57.  During the time Child remained with Father, Mother maintained regular contact.  *Id.* at 57-58.

[3] This represented a decrease from the initial eight hours of visitation per week afforded to Parents.  *See* N.T., 7/22/22, at 104; *see also* N.T., 5/20/22, at 82.

*also* N.T., 5/20/22, at 53. Explaining the gap in time, she testified, "I wanted to make sure I could get my sobriety secured, find local meetings, secure a job, a place of employment and get settled in at my family's home before I threw anything else onto my plate and make sure I could show up constantly [*sic*]." N.T., 7/22/22, at 100.

As acknowledged by Paternal Aunt, Mother engaged in FaceTime calls and physical visitations from July 22, 2021, through November 2021. *See* N.T., 7/22/22, at 20-21, 95-99; *see also* N.T., 5/20/22, at 41-44, 53-68; s*ee also* Mother's Exhibits 23, 24, 28A through 28E. Mother additionally participated in regular email communication with Paternal Aunt and/or Paternal Grandmother regarding the logistics of calls and visitations and related child-care concerns. *See* Mother's Exhibits 1, 1a through 20, 22; *see also* N.T., 7/22/22, at 20-21, 66-71.

Notably, Paternal Grandmother served as the visitation supervisor during this time.[4] N.T., 7/22/22, at 12. Physical visitation occurred in the home of the paternal grandparents, where Paternal Aunt and Child also resided. *See* Mother's Exhibits 1a, 22; *see also* N.T., 5/12/22, at 14. Paternal Aunt was also present during physical visits, which were strictly limited to two hours by timer with a five-minute warning. *See* N.T., 7/22/22 at 11-12, 42, 72, 141; *see also* N.T., 5/20/22, at 74. Paternal Aunt, as Child's

---

[4] Mother and Paternal Grandmother had a contentious relationship. *See* N.T., 7/22/22, at 59-63; *see also* N.T., 5/20/22, at 76.

custodian, and Paternal Grandmother, as the visitation supervisor, each enforced specific guidelines related to the request and/or confirmation of calls and visits not prescribed in the controlling custody order. *See* N.T., 7/22/22, at 17-18, 34-35, 84, 143; *see also* N.T., 5/20/22, at 58-60, 65; *see also* Mother's Exhibits 1a, 5.

Thereafter, in November 2021, upon the recommendation of Child's therapist, Paternal Aunt filed a petition to suspend Mother's visitation. The court granted her request on November 16, 2021, following a special relief hearing and/or presentation in Family Business Court, pending a future hearing. Mother was present with counsel. *See* N.T., 7/22/22, at 37, 89-90; *see also* N.T., 5/20/22, at 67-69, 50-51. Hearings were then held in January 2022 and February 2022, at which Mother was also present with counsel. *See* N.T., 7/22/22, at 91; *see also* N.T., 5/20/22, at 51, 68-69. Pursuant to order of February 10, 2022, the court permitted only therapeutic visits under control and approval of Child's therapist or designee. *See* N.T., 7/22/22, at 44-45, 113; *see also* N.T., 5/20/22, at 51.

Contemporaneously, Paternal Aunt filed a petition for adoption and a petition for the involuntary termination of parental rights on January 11, 2022. She later filed an amended termination petition on March 22, 2022.[5] The

---

[5] Upon review, we discern no distinction between the original and amended petitions. Mother testified that she was not served with a termination petition until April 2022. *See* N.T., 7/22/22, at 91.

orphans' court conducted hearings on May 12, 2022, May 20, 2022, and July 22, 2022.[6] Mother was present and represented by counsel at these proceedings. Child, who was four years old at the time, was represented by legal counsel and a guardian *ad litem*.[7] Paternal Aunt presented the testimony of Child's play therapist, Laura Tauzin, *via* Zoom. Ms. Tauzin was accepted as an expert in the field of child play therapy. N.T., 5/20/22, at 13. Paternal Aunt additionally testified on her own behalf. Mother presented the testimony of her stepmother, A.L. She also testified on her own behalf. Both Paternal Aunt and Mother also proffered numerous exhibits which were admitted. At the conclusion of the hearing, the court held the matter under advisement

_____

[6] On May 12, 2022, the court proceeded and heard testimony as to the termination of Father's parental rights only. Paternal Aunt presented the testimony of paternal grandparents, D.M. and P.M., Jr. ("Paternal Grandparents"). She additionally testified on her own behalf. While announcing its decision to involuntarily terminate Father's parental rights at the conclusion of the hearing, the court withheld the issuance of a decree. **See** N.T., 5/12/22, at 37-42.

[7] Child was represented by Carolyn J. Pugh, Esquire, as legal counsel on May 12, 2022. As Attorney Pugh was not available on May 20, 2022, Child was thereafter represented by Alexis K. Swope, Esquire, as legal counsel. Further, David T. Worley, Esquire, served as Child's guardian *ad litem*. Attorney Swope filed a closing memorandum with the orphans' court arguing against the termination of Mother's parental rights and submitted a letter joining Mother's brief submitted to this Court. Attorney Worley filed a closing memorandum with the orphans' court in support of the termination of Mother's parental rights. He further filed a joint brief with Paternal Aunt with this Court.

with all parties to submit memoranda and/or briefs within 30 days.[8]  N.T.,

7/22/22, at 158, 161-62.

By decree dated September 13, 2022, and entered September 14, 2022,

the orphans' court involuntarily terminated Mother's parental rights.  The court

further issued a contemporaneous opinion.[9]  Thereafter, on October 12, 2022,

Mother, through counsel, filed a timely notice of appeal, along with a concise

statement of errors complained of on appeal pursuant to Pa.R.A.P.

1925(a)(2)(i) and (b).  The court filed an opinion pursuant to Pa.R.A.P.

1925(a) on October 19, 2022.

On appeal, Mother raises the following issues for our review:

A. Whether the [orphans'] court erred or abused its discretion in refusing to hear testimony establishing the whole history and background underlying the custody matter?

B. Whether the [orphans'] court erred or abused its discretion by refusing to permit Father to testify on behalf of Mother?

C. Whether the [orphans'] court erred or abused its discretion by failing to properly consider obstacles placed in Mother's path to thwart her relationship with [] Child and by failing to analyze the custodial "gamesmanship" in this matter?

D. Whether the [orphans'] court erred or abused its discretion in terminating Mother's parental rights under 23 [Pa.C.S.A.] §

---

[8] The court requested that the parties specifically address the effect of the custody orders on Mother's obligations related to parental duties, and Mother's compliance thereto.  N.T., 7/22/22, at 156-57, 159-60.  All parties complied.

[9] While the orphans' court does not reference specific subsections of Section 2511 as it relates to the termination of parental rights in its decree, the court addresses Section 2511(a)(1) and (b) in its accompanying opinion, those subsections under which Paternal Aunt sought the termination of parental rights.

2511(a)(1) where the evidence was insufficient to find it clear and convincing that Mother failed or refused to perform parental duties?

E. Whether the [orphans'] court erred or abused its discretion in terminating Mother's parental rights without sufficient evidence of the effect the termination would have on [] Child or [] Child's developmental, physical, and emotional needs, and without sufficient evidence that the best interests of [] Child would be served by the termination?

Mother's Brief at 5 (suggested answers omitted).

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by Section 2511 of the Adoption Act, which involves a bifurcated assessment. If the trial court determines the petitioner established grounds for termination under

subsection 2511(a) by clear and convincing evidence, then the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In order to establish grounds for termination pursuant to Section 2511(a)(1) "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" *C.M.*, 255 A.3d at 363-64 (citation omitted) (footnote omitted). While undefined,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*L.A.K.*, 265 A.3d at 592 (internal citations and quotation marks omitted). Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *Id.* at 592 (citation omitted).

In assessing Section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the

- 9 -

termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct.  ***L.A.K.***, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case."  ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977).  Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" ***L.A.K.***, 265 A.3d at 593.   The totality of the circumstances includes consideration of the following:  "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)."  ***Id.***  As explained by our Supreme Court, "the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights.  The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." ***Id.***

With respect to Section 2511(b), our Supreme Court has outlined the inquiry as to a child's needs and welfare as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*T.S.M.*, 71 A.3d at 267.

> Additionally,

> While a parent's emotional bond with his or her child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> > In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2105) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (cleaned up).

Instantly, we turn to Mother's third and fourth issues, which we address together as they are interrelated. With these issues, Mother challenges the involuntary termination of her parental rights pursuant to Section 2511(a)(1),

- 11 -

arguing that there was insufficient evidence that she failed or refused to perform parental duties and that the court failed to consider evidence of obstacles and custodial gamesmanship.

The orphans' court described Mother's testimony as "incredible and self-serving." Orphans' Court Opinion, 9/14/22, at 4. In support of its determination that Mother failed to perform parental duties, the court asserted that, similar to a parent who is incarcerated, a parent subject to the constraints of a custody order must take affirmative action in relation to their child. *Id.* at 5-7, 9. The court stated, "Custody orders and extraneous circumstances, such as incarceration. . ., do not prohibit a parent from exerting themselves and taking active steps. . . ." *Id.* at 9. As the court noted, a custody order divests a parent of custody, not contact. *Id.* Dismissing Mother's testimony of lack of knowledge and inability to initiate contact as a result of the custody order, the court emphasized Mother's failure to contact Child's therapist. *Id.* at 7-8. Recognizing that Child had treated with his therapist since October 2020 and had 50 sessions at the time of the hearing, the court stated, "[Mother] never once reached for updates. Such decisions display a passive interest in the development of Child, not a desire to exert herself within the relationship." *Id.* The court further indicated that Mother failed to exercise all of the visitation and calls available to her under the custody order, pronouncing, "We are unpersuaded that Mother exerted herself with every means possible to have regular contact with Child. . . ." *Id.*

at 8-9. Finally, the court pointed to Mother's failure to request a modification of the custody order. *Id.* at 9-10. Specifically, the court addressed Mother's failure to challenge the finding of threat of harm. *Id.* at 10. The court highlights Mother's blame of others and found no barriers to Mother's ability to challenge the custody order. *Id.* at 11.

Mother, however, contends that the court ignored that she had no legal custody and could not contact Child's therapist, as well as disregarded testimony of herself, Paternal Aunt, and Child's therapist. Mother's Brief at 38-41. Mother asserts that Paternal Aunt conceded that Mother requested a three-way meeting with Child's therapist, but rather than advising Child's therapist, Paternal Aunt requested a letter from Child's therapist. *Id.* at 39. Moreover, Mother maintains that Child's therapist admitted that she would not be able speak with Mother without a release executed by Paternal Aunt. Child's therapist additionally confirmed that Paternal Aunt never informed her that Mother desired a meeting and never executed a release. *Id.* at 40. As such, Mother argues that "the court seemed to overlook the fact that Mother had no legal custody. [Child's therapist] could not have spoken to Mother without signing a release." *Id.*

Mother further asserts that, while she did not file a petition to modify in the custody matter, she appeared and defended her custodial rights, arguing against suspension. *Id.* at 41-45. Mother contends that her failure to file a

pleading in the custody matter does not justify termination of her parental rights. *Id.* at 44-45.

Mother recounts the undisputed affirmative parental duties and actions performed, which she maintains evidenced her sincere interest in Child and efforts to maintain communication and a relationship. *Id.* at 45-48. She faults the court for not recognizing her performance and instead focusing on any imperfections or shortcomings. *Id.* at 48-49, 53-54. She similarly asserts that the court failed to appreciate obstacles or barriers created by Paternal Aunt and/or Paternal Grandmother, in particular as a result of their expansive discretion related to calls and visitation. *Id.* at 55-56. Specifically,

> Mother testified extensively about the barriers that [Paternal] Aunt and the supervisor put up preventing Mother from furthering her relationship with [] Child, including, but not limited to, (1) limiting Mother's calls to once a week instead of twice; (2) requiring Mother, outside the parameters of the Order, to email on Sunday before 5:00 [p.m.] to schedule calls; (3) requiring, outside the parameters of the Order, a confirmation of physical visits 24 hours in advance; (4) setting a timer to end Mother's visits strictly after two hours even though the custody order permitted visits to be up to four hours; (5) [Paternal] Aunt being present for all visits between Mother and Child; and (6) [Paternal] Aunt ignoring Mother's requests to schedule a session with [] Child's therapist.

*Id.* In addition, Mother suggests there is an element of custodial gamesmanship with respect to these actions.[10] *Id.* at 56-60.

---

[10] While Mother additionally raises evidentiary claims related to the mechanical application of the statutory six-month requirement in challenging the orphans' court's finding of grounds for termination pursuant to Section 2511(a)(1), we

*(Footnote Continued Next Page)*

Upon review, we agree. The record reveals the following undisputed actions as it relates to Mother during the relevant six-month period immediately preceding the filing of the petition, July 2021 through November 2021: one FaceTime call in July; three FaceTime calls and three physical visits in August; three FaceTime calls in September;[11] three FaceTime calls and two physical visits in October; two FaceTime calls, one physical visit, and one court appearance in November, when Mother's visitation was then suspended pending further hearing.[12] *See* Mother's Exhibits 23, 24, 28A through 28E; *see also* N.T., 7/22/22, at 95-99; *see also* N.T., 5/20/22, at 41-44, 53-68. Notably, Mother brought birthday gifts for Child to the first physical visit in August and pumpkins to another visit. *See* N.T., 7/22/22, at 39-40, 75, 89, 105.

---

reiterate that trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *See C.M.*, 255 A.3d at 364. Notwithstanding, the six months immediately preceding the filing of the termination petition is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592. Given our determination, we need not address these claims.

[11] Mother quarantined due to COVID exposure and had no physical visits in September 2021. *See* N.T., 7/22/22, at 34; *see also* N.T., 5/20/22, at 61-62. The court indicated it did not hold this against her. *See* Orphans' Court Opinion, 9/14/22, at 8 n.2.

[12] Mother reported an additional FaceTime call in August, and Paternal Aunt testified to an additional physical visit in November. *See* N.T., 7/22/22, at 96; *see also* N.T., 5/20/22, at 42, 67. As we do not discern these to be undisputed, we do not include them.

Throughout July 2021 to November 2021, there was additionally regular email contact between Mother and Paternal Aunt and/or Paternal Grandmother regarding scheduling these FaceTime calls and physical visits. *See* Mother's Exhibits 1, 1a through 20, 22; *see also* N.T., 7/22/22, at 20. There were numerous other email communications regarding Child and his well-being, *inter alia*, birthday gifts for Child, how visits and calls can go more smoothly, additional calls, alternate visitation supervisors, Mother's new pregnancy and how to discuss this with Child, Father's absence, Child's diagnoses and treatment plan, and Mother's desire for a three-way meeting with Child's therapist. *See* Mother's Exhibits 1, 1a through 22; *see also* N.T., 7/22/22, at 20-21, 66-71.

Notwithstanding, our review confirms that Paternal Aunt and Paternal Grandmother generated extrajudicial obstacles which impeded Mother from exercising additional calls and visits.[13] As Child's custodian and the visitation supervisor, respectively, both exerted a great deal of discretion with regard to calls and visitation. As indicated *supra*, each enforced specific guidelines related to the request and/or confirmation of calls and visits, including that the request for a call be received by Sunday at 5:00 p.m., and that Mother confirm a physical visit 24 hours prior to a scheduled visit. N.T., 7/22/22, at

---

[13] Mother acknowledged that she missed a call or two. *See* N.T., 7/22/22, at 82. She additionally canceled a physical visit due to the birth of her second child. *See* N.T., 7/22/22, at 35-37, 82-83, 124.

17-18, 34-35, 84; N.T., 5/20/22, at 58-60, 65; *see also* Mother's Exhibits 1a, 5. These deadlines were not stipulated by the controlling custody order.[14] N.T., 5/20/22, at 58-59; *see also* Mother's Exhibit 27.

Significantly, Paternal Aunt denied Mother's request for a second call each week, indicating that she was saving a call for Father should he decide to re-engage.[15, 16] N.T., 7/22/22, at 16-17, 83-84; N.T., 5/20/22, at 36, 52-53; *see also* Mother's Exhibit 6. Paternal Aunt chose the weeks of July 25, 2021, and November 21, 2021, as vacation weeks where no calls or visitation were required, which she enforced. N.T., 7/22/22, at 123; N.T., 5/20/22, at 54, 68; *see also* Mother's Exhibits 2, 17. Further, Paternal Aunt did not approve several calls, due to Child's emotional well-being and/or Mother's request coming later than Paternal Aunt's self-imposed deadline.[17] *See* N.T., 7/22/22, at 33; *see also* N.T., 5/20/22, at 63-65; *see also* Mother's Exhibits 9, 16, 24. Lastly, Paternal Grandmother canceled one physical visit in August

---

[14] Paternal Aunt admitted that the requirement of confirmation 24 hours prior to visitation was not included in the custody order. She instead indicated that the judge in the custody matter verbally approved such restrictions by the visitation supervisor. *See* N.T., 5/20/22, at 58-59.

[15] Father had not visited with or had contact with Child since May 2021. *See* N.T., 5/12/22, at 11-13.

[16] Paternal Aunt explained, "The Judge at the other hearing told me not to give her anything extra and to stick exactly to the order, so that's what I did." N.T., 5/20/22, at 53.

[17] Paternal Aunt additionally canceled and rescheduled a call, citing Child having a "stressful day". Mother's Exhibit 15; *see also* N.T., 5/20/22, at 65.

and another in October as Mother's confirmation was not received within the specified deadline and/or did not affirmatively state her confirmation. *See* N.T., 7/22/22, at 17-18, 34-35, 83-84, 124, *see also* N.T., 5/20/22, at 58-59; *see also* Mother's Exhibits 22, 23.

Moreover, physical visitations occurred exclusively in the home of Paternal Grandparents, where Paternal Aunt and Child also resided. *See* Mother's Exhibits 1a, 22; *see also* N.T., 5/12/22, at 14. As such, Paternal Aunt was also present during physical visits, which were strictly limited to two hours by timer with a five-minute warning. *See* N.T., 7/22/22, at 11-12, 42, 72, 141; *see also* N.T., 5/20/22, at 74. Mother stated, "The timer went off, it was time to go. Walk to the door is what they would tell him to do." N.T., 7/22/22, at 72. Mother and her stepmother described Paternal Aunt and Paternal Grandmother as "overbearing" and "very very involved" in these visits. *Id.* at 80-81, 140.

While Mother acknowledged that she did not seek to modify the custody order,[18] when asked how she addressed the custody situation, she indicated that she took advantage of the limited custody afforded her and took care of herself and her sobriety and focused on stability. *See* N.T., 7/22/22, at 115-16, 118. This included seeking out local meetings and a sponsor and engaging in counseling, which Mother felt were addressing the concerns of the court.

---

[18] Mother initially referenced a lack of awareness and advice and information of former counsel once retained. *See* N.T., 7/22/22, at 101-02.

***See id.*** at 116-17. She further noted that she felt like she had begun to make progress from July through November 2021 but did not believe she had amassed enough to establish or form the basis of a legal modification. ***See id.*** at 117, 125-26. Mother explained, "From the month that I started visitations with my son, including the month that we didn't have visitation due to COVID, all the way through November, it felt like we were just starting to make some headway back into making progress again. It didn't feel like I had enough to stand on in court yet in order to modify anything. I felt like I wanted to continue building what we were building." ***Id.*** at 126.

In ***L.A.K.***, our Supreme Court reversed this Court's order and remanded for reinstatement of the trial court's order denying termination where, after no contact for three and a half years and maintaining a year of sobriety, the father filed a petition to modify custody a week prior to the mother's and stepfather's filing of a termination petition. 265 A.3d at 583-85. The Court stated,

> This evidence supports the trial court's findings that [f]ather struggled with alcoholism and made repeated attempts at obtaining sobriety between 2016 and 2019; that these struggles were the reason [f]ather did not contact the children during that time; that [f]ather's quest for sobriety was driven by his desire to rebuild parental relationships with the children; and that [f]ather distanced himself from the children out of a concern for their best interests. It was within the trial court's discretion to credit this testimony and conclude, as a finding of fact that the Superior Court was bound to respect, that in view of the totality of the circumstances, that [f]ather acted with reasonable firmness in overcoming the obstacles that kept him from performing parental duties. The trial court concluded that [f]ather's conduct (his failure to maintain the parent-child relationship) was reasonably

- 19 -

explained, and in such circumstances, our law provides that parental rights will not be terminated. Finding no abuse of discretion in the trial court's ruling that Appellees failed to prove their case under Section 2511(a)(1) by clear and convincing evidence, we conclude that the Superior Court erred in ruling to the contrary.

*Id.* at 599 (internal citations omitted).

Here, Mother likewise dealt with alcohol issues and worked toward obtaining sobriety and maintaining stability. However, while Mother did not proactively file and initiate proceedings in the custody matter within the six months prior to the filing of the termination petition, Mother sustained several months of contact until two months prior to filing of termination petition when visitation was suspended. Further, she participated in the custody proceedings and defended her custodial rights to Child.

Acknowledging the parallel custody matter, the **L.A.K.** Court additionally noted the trial court's recognition of the "crucial future role of the custody court" and that the "denial of the termination petition would not catapult [f]ather into the children's lives without necessary acclimation and boundaries." **Id.** at 598.

Similarly, in the instant matter, denial of Paternal Aunt's petition for involuntary termination of parental rights with respect to Mother would not place Child back in Mother's custody. Pursuant to the February 2022 custody order, Child would remain in Paternal Aunt's custody. However, Mother would be entitled to therapeutic visitation at the discretion of Child's therapist and have the opportunity to continue to establish her relationship with Child. If

she is unable to do so, Paternal Aunt may then again file to involuntarily terminate Mother's parental rights.

Hence, upon review, the above-recited uncontested activity between July 2021 and November 2021 supports confirmation of Mother's performance of parental duties within the six months prior to the filing of the termination petition. **See L.A.K.**, 265 A.3d 580 (Pa. 2021). Mother actively participated in the custody action by defending her custodial rights. While she did not file a petition to modify, Mother's conduct was clearly aimed at maintaining her relationship with Child. **See Adoption of S.H.**, 383 A.2d 529, 533 (Pa. 1978) (stating, "a mere showing that the father could conceivably have pursued legal action more promptly cannot justify termination of the father's rights.").

Significantly, "the focus under Subsection 2511(a)(1) is not the degree of success a parent may have had in reaching the child, but examines whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship." **C.M.**, 255 A.3d at 365 (citations omitted). Therefore, the evidence was insufficient to establish grounds for termination pursuant to Section 2511(a)(1) and the orphans' court decree should be reversed with respect to Mother. As we find insufficient evidence to establish grounds for termination pursuant to Section 2511(a)(1), we do not address Section 2511(b) or the remainder of Mother's issues.

For the foregoing reasons, we reverse the decree as to Mother. We remand to the orphans' court for entry of an order denying Paternal Aunt's petition for involuntary termination of Mother's parental rights.

Decree reversed in part. Case remanded. Jurisdiction relinquished.

Judge McCaffery joins the memorandum.

Judge Dubow files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/25/2023